

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2001

# Goldstein v. Johnson & Johnson

Precedential or Non-Precedential:

Docket 00-5149

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Goldstein v. Johnson & Johnson" (2001). *2001 Decisions.* Paper 115.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/115

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 25, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5149

GIDEON GOLDSTEIN, M.D., PH.D., Appellant

v.

JOHNSON & JOHNSON; RETIREMENT PLAN OF
JOHNSON & JOHNSON AND AFFILIATED COMPANIES;
CONSOLIDATED RETIREMENT PLAN OF
JOHNSON & JOHNSON; THE EXCESS BENEFIT PLAN OF
JOHNSON & JOHNSON

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 96-cv-5643)
District Judge: Honorable Alfred M. Wolin

Argued: September 14, 2000

Before: BECKER, Chief Judge, NYGAARD and
AMBRO, Circuit Judges.

(Filed: May 25, 2001)

       SHEPPARD A. GURYAN, ESQUIRE
        (ARGUED)
       BRUCE H. SNYDER, ESQUIRE
       Lasser Hochman, L.L.C.
       75 Eisenhower Parkway
       Roseland, NJ 07068

       Counsel for Appellant

        FRANCIS X. DEE, ESQUIRE
          (ARGUED)
        STEPHEN F. PAYERLE, ESQUIRE
        Carpenter, Bennett & Morrissey
        Three Gateway Center
        100 Mulberry Street
        Newark, NJ 07102

        Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by Dr. Gideon Goldstein fr om the adverse judgment of the District Court in favor of his former employer, Johnson & Johnson (J&J), following a bench trial. It requires us to addr ess again the question of the proper scope of judicial review of the decision of a plan administrator acting under the Employee Retir ement Income Security Act of 1974 (ERISA), 29 U.S.C. S 1001 et seq., to deny benefits to a participant. Although this topic has been exhaustively examined in the context of benefits denials generally, see Firestone T ire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), and in the context of decisions made by potentially self-interested administrators specifically, see Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), we now face a benefits-denial decision in a new context: that of a "top hat" plan, i.e., a"plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." Miller v. Eichleay Eng'rs, Inc., 886 F.2d 30, 34 n.8 (3d Cir. 1989) (citations omitted).

In Firestone Tire, the Supreme Court explained that because ERISA plans are analogous to "trusts" for employees, with the plan administrator serving as trustee, a reviewing court owes deference to the discretionary decisions of the administrator just as the discr etionary decisions of a trustee would receive defer ence. See Firestone Tire, 489 U.S. at 111. In Pinto, we interpreted Firestone Tire

2

to mandate a more searching scrutiny of such discretionary decisions in situations where the impartiality of the administrator is called into question, either because the structure of the plan itself inherently cr eates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case. See Pinto, 214 F.3d at 383-87. However, both Firestone Tire and Pinto are premised on the analogy of an ERISA plan to a traditional trust.

In contrast, this Court has routinely tr eated top hat plans differently from other kinds of plans. See, e.g., In re New Valley Corp., 89 F.3d 143, 148-49 (3d Cir. 1996) (explaining differences between top hat plans and other ERISA plans). This is because top hat plans ar e expressly exempted from most of the substantive ERISA r equirements normally employed to protect workers' interests in their plans. See 29 U.S.C. SS 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are unfunded, they do not vest, and they are not required to name fiduciaries. See id. Under such circumstances, the analogy to trust law fails, and the plans are more appropriately consider ed as unilateral contracts, whereby neither party's interpretation is entitled to any more "deference" than the other party's. See In re New Valley, 89 F.3d at 149 (top hat plans are governed by the federal common law of contract); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir. 1995) (same).

There appears to be no reason, however , why the precondition that mandates deference in the context of the more typical ERISA plan -- that is, a written clause explicitly granting authority to the plan administrator to interpret the terms of the plan, see Firestone Tire, 489 U.S. at 111-12 -- should not be given effect as part of the unilateral contract that constitutes a top hat plan. In accordance with ordinary contract principles, we conclude that, depending on the language used, such a clause has the potential to grant the plan administrator discr etion to construe the terms of the plan, subject to the implied duty of good faith and fair dealing. See Restatement (Second) of Contracts S 205. And, as with any other contract term, courts retain the authority to review the administrator's compliance with that duty to exercise discr etion in good faith.

3

The dispute in this case centers around the proper characterization of an unusual form of compensation that Goldstein received during his tenure at J&J. The question is whether this compensation, which involved paying to Goldstein a specified percentage of the sales of products he developed, should have been taken into account for the purpose of determining his monthly pension under the terms of J&J's retirement plans. Goldstein argues that these payments should have been used to calculate his pension; the plan administrator disagrees. Here, the grant of discretion to the plan administrator to interpret the plan's terms was broad, in that the administrator was given "sole authority" to "[i]nterpret the provisions" of the plan, and the administrator's actions were to be "final and conclusive for all persons." Moreover, the District Court's factual conclusion that the administrator at all times acted in good faith with respect to the employee's claim for benefits is not clearly erroneous. Accordingly, we will affirm the judgment of the District Court denying Goldstein's claim for additional benefits.

I. Facts

Goldstein is a physician who specializes in immunobiology research, specifically AIDS research. In 1977, Goldstein, then employed by the Sloan–Kettering Institute for Cancer Research, received a patent on the drug thymopentin, which he assigned to his employer. Later that year, he joined Ortho Pharmaceutical Corporation, a subsidiary of J&J. Ortho licensed the thymopentin patent from Sloan–Kettering to allow Goldstein to continue his work, paying a royalty for the license based on sales, and paying a "commission" to Goldstein equal to one percent of the royalty.1

_____

1. The employment contracts consistently refer to these payments as "commissions"; however, the parties dispute whether they were truly "commissions" or were instead "royalties." For the purposes of this opinion, we will follow the contractual language and refer to the payments as "commissions," although our use of the term is not intended to imply a legal conclusion as to the proper characterization of the payments.

4

In 1987, J&J created the Immunobiology Resear ch Institute, headed by Goldstein. At that time, Goldstein entered into a new employment contract with J&J. This new contract contained a section titled "Compensation," with three subheadings. The first subheading,"Salary, Bonus and Employee Benefits" explained that Goldstein would receive a "salary and cash bonus each year," and would be "entitled to participate in all general employee benefit plans . . . in accordance with their terms, including . . . retirement plans." The second subheading, "Commissions," provided that in addition to his salary, Goldstein would receive a commission equal to one and one-fourth percent of the sales of the pr oducts he developed. The commissions would continue at a r educed rate for five years after the expiration of the patents, irrespective of Goldstein's continued employment with J&J. The agreement also provided that J&J was under no obligation to market Goldstein's products, and that the salary and bonus payments were to be paid "in lieu of " that obligation. The third subheading stated that Goldstein would not participate in J&J's executive stock bonus plan, a provision to which Goldstein had agreed in exchange for the right to receive commissions. As it happened, throughout Goldstein's relationship with J&J, the only patent that was actually marketed -- and thus, the only patent that generated income to Goldstein -- was the thymopentin patent. Despite this fact, Goldstein's commissions greatly exceeded his salary and bonus payments, constituting almost 75% of his total compensation.

Throughout Goldstein's tenure with J&J, the company maintained a system of retirement benefits for its employees, consisting of two interrelated plans (together, "the Plan"). The first was an ordinary funded pension plan (the Retirement Plan), subject to all of ERISA's substantive requirements. Under this plan, retir ees would receive monthly benefits in an amount determined by a formula based on the average compensation earned by the employee during his or her five highest consecutive ear ning years with the company. The amount of these payments was capped in order for the plan to maintain its qualified status under the Internal Revenue Code. See 26 U.S.C. S 415. In

5

addition to its Retirement Plan, J&J also maintained what it termed an "Excess Benefit Plan" (the Top Hat Plan) designed to work in tandem with the Retirement Plan.2 The Top Hat Plan paid out the benefits due an employee under J&J's pension formula that, due to the cap, could not be paid directly from the Retirement Plan.

Both plans were administered by a Pension Committee. Under the terms of the Retirement Plan, the Pension Committee was granted "sole authority" to"interpret" the terms of the plan. Under the terms of the Top Hat Plan, benefits would be calculated according to the terms of the Retirement Plan, and the "decisions made by and the actions taken by [the Pension Committee] in the administration of this Excess Plan shall be final and conclusive for all persons." By early 1995, the Committee had delegated much of its authority to interpr et the Plan to a subcommittee known as the Benefits Claims Committee (BCC). The Pension Committee was the named fiduciary of the Retirement Plan. However, the T op Hat Plan was, by definition, unfunded (i.e., benefits wer e paid directly out of J&J's operating revenues), and its administrator not only had no fiduciary responsibilities, but was also explicitly exempted from personal liability for actions taken with respect to the plan. Obviously, both the lack of fiduciary responsibility and the exemption from personal liability would not have been possible had the excess benefit plan been subject to ERISA's general requirements. See In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996).

Because benefits under the Plan were deter mined by reference to the employee's compensation during his or her employment with J&J, it was necessary for the Plan to define the types of compensation that would be included in

_____

2. ERISA provides that plans designed solely to provide benefits in excess of the statutory cap contained in 26 U.S.C. S 415 are "excess benefit plans" that are not covered by ERISA at all. See 29 U.S.C. S 1002(36); Gamble v. Group Hospitalization & Med. Servs., 38 F.3d 126, 128 (4th Cir. 1994). However, despite the fact that J&J styled this an "Excess Benefit Plan," we determined on a pr evious appeal that the plan was, in fact, a top hat plan, and thus governed by ERISA. See Goldstein v. Johnson & Johnson, No. 98-6065 & 98-6172, slip op. at 10 (3d Cir. Mar. 4, 1999).

the benefit calculation. Throughout Goldstein's employment with J&J, the relevant Plan provisions explained that:

> "Covered Compensation" means basic r emuneration paid to an Employee including amounts deferr ed at the Employee's election under the Johnson & Johnson Savings Plan, during periods for which such Employee receives Credited Service under this Plan. Covered Compensation for a year includes straight time pay for a regular workweek, prior year salesman's commissions and other specified forms of incentive compensation, and incentive or piecework ear nings, but excludes premiums for overtime shift, Satur day and Sunday (6th or 7th workday) or holiday work, arbitrary bonuses, the value of gifts, management incentive bonuses and certificates of extra compensation.[3]

In addition, the Summary Plan Description explained that:

> Included in your Plan earnings will be your straight time pay for your regular workweek, sales-person's commissions, overtime, shift differential, year-end cash Christmas gift, and year-end executive cash bonus. All other earnings, for example, Johnson & Johnson Achievement Award and stock, not specifically described above, are not included in Plan earnings.

In December 1994, J&J modified its plan, r etroactive to 1989. In this new version of the plan, the definition of "compensation" was rewritten as:

> "Covered Compensation" means basic r emuneration paid to an Employee including amounts deferr ed at the Employee's election under the Johnson & Johnson Savings Plan and salary reduction amounts under a plan that meets the requirements of Section 125 of the Code, during periods for which such Employee r eceives Credited Service under this Plan. Cover ed Compensation for a year includes straight time pay for a regular workweek, current year salesperson's paid commissions, other specified forms of incentive

_____

3. These Certificates of Extra Compensation, or CECs, were the functional equivalent of a share of stock.

> compensation and incentive or piecework earnings, year-end cash Christmas gift, year-end cash executive bonus, overtime, shift, Saturday and Sunday (6th or 7th workday), and holiday pay. . . . Covered Compensation shall include the annual value of stock contract awards and dividend equivalents paid on unissued stock contract shares and, if applicable, non-vested Certificates of Extra Compensation (CECs).

The new Summary Plan Description defined "Plan Earnings" as:

> Compensation used in determining Pension Plan benefits, including consideration of straight-time pay for your regular workweek, salesperson's commissions, overtime, shift differential, year -end cash gift, year-end executive cash bonus, the value of delivered r estricted stock awards and dividend equivalents paid on undelivered restricted stock awards, dividend equivalents paid on non vested CEC units, and sales management incentive compensation.

As the quote demonstrates, this new Summary Plan Description no longer contained the sentence excluding forms of compensation not otherwise specified.

Just before the changes to the 1994 Plan wer e enacted, Goldstein retired from J&J and began to receive his pension under the terms of the Retirement Plan and the Top Hat Plan. At this time, J&J and Goldstein also began to negotiate a severance. Discussions continued until April 1996, mostly focusing on the disposition of the intellectual property rights to the research Goldstein had conducted during his tenure. Eventually, an Agreement and Mutual Release was signed by both parties (Release). The Release provided that all claims by Goldstein r egarding "the Employment Agreement, the termination of said agreement . . . illegal discrimination, harassment or r etaliation based on age, sex, race, religion, national origin, citizenship, disability . . . breach of contract, br each of promise . . . wrongful denial of benefits . . . ." wer e waived; however, the Release expressly preserved "Goldstein's right to participate in J&J's Retirement Plan . . . in accor dance with the terms of said plan." Both provisions were added in response to a

8

request by Goldstein's attorney that Goldstein be permitted to participate in the pension plans.

The day after the Release was signed, Goldstein telephoned Efrem Dlugacz, a member of the Pension Committee, to protest the calculation of his pension benefits. Specifically, Goldstein objected to the fact that the "compensation" used to compute his pension did not include the commissions he had earned on the thymopentin patent, but rather were based solely on his salary and annual bonuses. Goldstein was then r eceiving a pension of $7,606 per month; had his commissions been included, his pension would have been $30,126 per month. Goldstein admits that at the time he executed the Release, he was aware of his intention to challenge the calculation of his pension. All of the extra benefits claimed by Goldstein would have been paid out of the Top Hat Plan.

On Dlugacz's suggestion, Goldstein lodged his objections in writing. Garry Goldberg, Manager of Pension Administration, having reviewed Goldstein's claim, addressed a memo to the BCC taking the position that Goldstein's commissions were not pensionable. Considering only whether Goldstein's commissions fell into one of the categories of specifically enumerated pensionable items, Goldberg concluded that the only potentially r elevant categories were "salesperson's commissions" and "sales management incentive compensation," but that these items only referred to the compensation r eceived by salespeople. Under this interpretation, Goldstein's ear nings did not qualify. Goldstein was not given a copy of this memo or asked to respond.

With Goldstein's knowledge, the BCC met in May 1996 to consider his claims. In June of that year, Michael J. Carey, Chair of the BCC, wrote to Goldstein denying his claim, on the ground that Goldstein was not a salesperson and that the commissions were not "incentive compensation" as that term was used in the definition of "Cover ed Compensation." Letters were exchanged in which Goldstein ar gued that his commissions were, in fact, covered under the Plan because his commissions were "incentive or piecework earnings." Carey maintained the position that the ter m "incentive or piecework earnings" was intended to apply to production

employees who exceeded their quotas, and that any type of earnings not explicitly mentioned in the 1994 definition of "Covered Compensation" was not pensionable. Goldstein began threatening to sue in September 1996, and shortly thereafter, the Pension Committee met and an attorney in the Tax Department, Robert Keefer, "presented" Goldstein's claim. After considering the evidence and the correspondence that had been exchanged, the Pension Committee agreed that the BCC's determination that Goldstein's commissions were not "cover ed compensation" was "appropriate."

II. Procedural History

In October 1996, Goldstein filed suit against J&J in New Jersey Superior Court for the additional benefits under 29 U.S.C. S 1132, ERISA's civil enforcement provisions. J&J removed to the District Court for the District of New Jersey, and that court granted summary judgment to J&J on the ground that the Release included all claims Goldstein had against J&J for further pension benefits. On appeal, we vacated the judgment and remanded to the District Court, holding that the Release was ambiguous as to its scope and thus there could be no judgment as a matter of law based upon it. See Goldstein v. Johnson & Johnson, No. 98-6065 & 98-6172 (3d Cir. Mar. 4, 1999).

The District Court then held a bench trial in which Goldstein claimed that his commissions were covered under the Plan, either as "salesperson's commissions" or "sales management incentive compensation," or because the items included on the list of pensionable compensation wer e meant only as exemplars of the general category of "basic remuneration," into which his commissions fell. J&J defended on the ground that the Plan, by its terms, did not cover Goldstein's commissions, and further that the interpretation of the Plan offered by the Plan administrators was deserving of deference under Firestone Tire.4 The case

_____

4. J&J also argued that Goldstein had agr eed in the Release to waive these claims against J&J, and that even if the Release did not cover these particular claims, Goldstein's failure to mention his intention to sue for greater benefits during the negotiations should estop him from asserting his claims at this time. The District Court did not find it necessary to reach these alternative ar guments, and, given our disposition, neither do we.

was tried prior to our decision in Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir . 2000), and the District Court reviewed the determination of the BCC de novo, concluding that Goldstein's commissions wer e not "Covered Compensation" as that phrase was used in the Plan. Further, the court found that J&J had r eviewed Goldstein's claim in good faith. See Goldstein v. Johnson & Johnson, No. 96-5643, slip op. at 22-23 (D.N.J. Feb. 14, 2000) ("[T]he Court finds as a fact that the Johnson & Johnson Benefits Claims Committee and the Pension Committee . . . exerted their best efforts accurately to interpret the plan and fairly to adjudicate Goldstein's claim, uninfluenced by whether these benefits would have been paid directly by Johnson & Johnson . . . .").5 Accordingly, the court entered judgment for J&J. Goldstein now appeals. The District Court had jurisdiction over this action pursuant to 28 U.S.C. S 1331. We have jurisdiction pursuant to 28 U.S.C. S 1291. We have plenary review over a district court's conclusions of law, and we r eview its factual conclusions for clear error.

III. Discussion

A. Standard of Review of a Plan Administrator's
        Interpretations

ERISA was enacted to ensure that employer -provided benefit plans are safeguarded and maintained so as to be available to employees when they are due. The Act does not mandate that an employer provide benefits, and has nothing to say about how these plans are to be designed. See Nazay v. Miller, 949 F.2d 1323, 1329 (3d Cir. 1991). The Act does, however, ordinarily imposefiduciary duties upon plan administrators once a plan has been implemented. See Noorily v. Thomas & Betts Corp. , 188 F.3d 153, 158 (3d Cir. 1999).

Administrators of ERISA plans may have various degr ees of responsibility, depending on the plan's design. Some may
_____

5. We recognize that the court did not use the term of art "good faith" in its opinion; however, we do not believe that the quoted statements can be interpreted as anything other than a finding of good faith.

be charged simply with carrying out the plan according to its terms; others may have more discretionary authority to interpret the terms of the Plan and make benefits determinations. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). For many years, in cases in which beneficiaries sued administrators alleging that benefits had been wrongly denied them, courts attempted to set standards as to the degree to which they would defer to the decisions of the administrators who, by the design of the plan -- which the employer was completely free to set -- were charged with implementing it.

In Firestone Tire, the issue finally reached the Supreme Court. Firestone Tire had sold its plastics division to a new company, and the former employees, who had been rehired without interruption and at the same pay rates, sued Firestone for the benefits they had accrued under Firestone's termination pay plan. Firestone, which was also the administrator of the plan, denied the benefits on the ground that the sale to the new company did not constitute a triggering event within the terms of the plan requiring the payment of benefits. See id. at 105-06. In determining the appropriate standard of review to apply to Firestone's interpretation of its plan, the Supreme Court began by observing that "ERISA abounds with the language and terminology of trust law." Id. at 110. The Court, particularly noting that ERISA requires that benefits plans have named fiduciaries and authorizes suits against them for breach of fiduciary duty, see id., analogized ERISA administrators to trustees, and explained that in setting a standard of review for an administrator's decision, it would follow ordinary principles of trust law, see id. at 111.

In the Court's view, under ERISA, an administrator is a fiduciary "to the extent he exercises any discretionary authority or control." Id. at 113 (emphasis omitted). Under ordinary trust principles, the decisions of trustees who are granted discretionary authority to interpret the trust's terms receive only arbitrary and capricious review from courts. See id. at 111. Extending these principles to ERISA, the Court held that although the decisions of these fiduciaries of ERISA plans would receive deferential review from courts, administrators who were not granted

12

discretionary authority to construe a plan's terms would receive no deference, and their decisions would be reviewed in accordance with ordinary contract principles. See id. at 111-15. The Court also left open the possibility that ERISA fiduciaries operating under a conflict of inter est would receive less deferential review. See id. at 115. Under our decision in Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), a court will apply heightened scrutiny to an administrator's determination either when the plan, by its very design, creates a special danger of a conflict of interest, or when the beneficiary can point to evidence of specific facts calling the impartiality of the administrator into question. See id. at 383-87; see also Bill Gray Enters., Inc. Employee Health & Welfar e Benefit Plan v. Gourley, Nos. 00-3412 & 00-1400, 2001 WL 427626, slip op. at 15 (3d Cir. Apr. 26, 2001).

If J&J's Plan were an ordinary ERISA plan, then, given the broad discretion granted to the Pension Committee, we would apply the standards set forth in Fir estone Tire and Pinto. We would first determine whether any conflict of interest existed for the Plan administrators, and then we would calibrate our standard of review for their benefits decision accordingly. Because Goldstein's claim for benefits would be paid entirely out of the Top Hat Plan and the funds would come directly from J&J's operating revenues, we perforce would consider these facts r elevant in choosing our standard of review. See Pinto, 214 F.3d at 389.

However, a top hat plan is a unique animal under ERISA's provisions. These plans are intended to compensate only highly-paid executives, and the Department of Labor has expressed the view that such employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees. See DOL Opin. Letter 90-14 A, 1990 WL 123933, at *1 (May 8, 1990). We have held that such plans are more akin to unilateral contracts than to the trust-like structure normally found in ERISA plans. See In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir. 1995). Accordingly, top hat plans are not subject to any of ERISA's

13

substantive provisions, including its r equirements for vesting and funding. See 29 U.S.C. SS 1051(2); 1081(a)(3). Not only are the administrators of these plans not subject to ERISA's fiduciary requirements, see 29 U.S.C. S 1101(a), but the top hat plan at issue in this case specifically exempts its administrators from any personal liability for actions taken with regard to the plan.

Given the unique nature of top hat plans, we believe the holding of Firestone Tire requiring deferential review forthe discretionary decisions of administrators to be inapplicable. The deferential standard of review granted to plan administrators exercising discretionary authority was specifically an outgrowth of the Supr eme Court's analogy to trust law, and particularly the fiduciary r esponsibilities possessed by administrators with discretionary authority. See Firestone Tire, 489 U.S. at 110-11. In contrast, a top hat administrator has no fiduciary responsibilities. Top hats are more analogous to the second scenario identified by the Supreme Court, i.e., when a plan administrator has no discretion to interpret the plan's ter ms (and thus is not a fiduciary), in which case the plan is reviewed de novo, according to the federal common law of contract. See id. at 112. That is, although, as was done in this case, "discretion" may be explicitly written into a top hat plan document, it does not act as a legal trigger altering the standard of review. Thus, we believe that, in accordance with our earlier precedent, top hat plans should be treated as unilateral contracts, and neither party's interpr etation should be given precedence over the other's, except in accordance with ordinary contract principles.6

In reaching this conclusion, we reject J&J's contention that, because ERISA's definitional section lists a"fiduciary" as one who exercises discretion in interpr eting the terms of

_____

6. We are aware that other courts have applied Firestone Tire's holding to top hat plans. See, e.g., Olander v. Bucyrus-Erie Co., 187 F.3d 599, 604 (7th Cir. 1999); Schikore v. BankAmerica Supplemental Retirement Plan, No. C 98-3857 SI, 1999 WL 605826 (N.D. Cal. Aug. 2, 1999). However, these cases do not explicitly question whether Firestone Tire should be so freely transferrable, and, in fact, in at least one instance, the court specifically "deferred" to the administrator of a top hat plan on the basis
that the administrator was a fiduciary. See Olander, 187 F.3d at 607.

14

a plan, see 29 U.S.C. S 1002(21)(a), administrators of top hat plans are also fiduciaries. To begin with, ERISA explicitly states that top hat plans are not subject to the ERISA's fiduciary requirements. See  29 U.S.C. S 1101(a). Further, it is well established in the caselaw that there is no cause of action for breach of fiduciary duty involving a top hat plan. See In re New Valley Corp., 89 F.3d at 153; accord Demery v. Extebank Compensation Plan , 216 F.3d 283, 290 (2d Cir. 2000) (dismissing ERISA claims for breach of fiduciary duty in a top hat plan on the ground that top hat administrators are not bound byfiduciary standards); Duggan v. Hobbs, 99 F .3d 307, 313 (9th Cir. 1996) (same). Finally, we find J&J's argument disingenuous in light of the explicit terms of its own Plan absolving the administrators of the Top Hat Plan from individual liability. These terms, which designate the Pension Committee as "administrator" (but not fiduciary), stand in marked contrast to the parallel provisions of the Retirement Plan that explicitly name the same committee both as administrator and as fiduciary.

We acknowledge that our holding may appear to have the potential to create anomalous results. T o begin with, many plans may be structured as the one curr ently before us, whereby benefits are calculated in a similar manner whether they are to be paid from an or dinary retirement plan or from a top hat plan. Differ ent standards of review for each may result in different interpretations of a single plan's terms, even though on paper the two halves are designed to work in tandem and to yield identical r esults. Our holding may also seem anomalous in that we appear to be according the least deference to plan administrators when they are determining benefits of highly-paid employees, the very group that the Department of Labor believes is best able to protect its own inter ests.

However, we believe that these potentially anomalous results are not as severe as may appear at first blush. The "deference" ordinarily due an ERISA plan administrator is only available to the extent that the plan grants that administrator discretion to interpret the terms of the plan. See Firestone Tire, 489 U.S. at 111-13. In the absence of such discretion, a court will review the terms of the plan de

15

novo. See id. Thus, the possibility for dif ferent standards of review between top hat plans and other ERISA plans will only arise when the plan has explicitly granted discretion to the plan administrators. But in the case of a top hat plan, even though an administrator may not receive"deference" under Firestone Tire, any grant of discretion must be read as part of the unilateral contract itself. As a ter m of the contract, it must be given effect as or dinary contract principles would require, thus minimizing the potential for differing standards of review for identical plan terms.

Ordinary contract principles requir e that, where one party is granted discretion under the ter ms of the contract, that discretion must be exercised in good faith -- a requirement that includes the duty to exer cise the discretion reasonably. See Restatement (Second) of Contracts S 205 & cmt a; see also Ber ger v. Edgewater Steel Co., 911 F.2d 911, 919 (3d Cir. 1990) (term of an ERISA retirement plan allowing early retir ement when "the Company considers that such retirement would . . . be in its interest" obligates the employer to r each its decision in good faith). As with any other contract term, courts retain the authority to conduct a de novo review as to whether a party has complied with its good-faith obligations.

Goldstein argues that if the plan is a traditional contract, the clause granting interpretive discretion to J&J administrators should be voided as unconscionable for it is the functional equivalent of designating an inter ested party as an arbitrator. We do not agr ee. Contracts are often considered to be enforceable even when particular parties are able to specify terms in the course of dealing, subject only to the duty of good faith. See, e.g., O.N. Jonas Co., Inc. v. Badische Corp., 706 F.2d 1161 (11th Cir. 1983) (interpreting the Uniform Commercial Code); TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542 (6th Cir. 1981) (same). Goldstein has cited nothing to the contrary, and we do not consider cases involving due process rights to impartial arbitrators, such as United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128 (3d Cir . 1986), to be apposite to the issue at hand. Thus, we see nothing impr oper in Goldstein and J&J contracting to allow Goldstein to

16

participate in a pension plan under which J&J will have responsibility to administer the plan and interpret ambiguous terms, so long as its interpr etations are reasonable and it exercises its responsibilities in good faith. In fact, given that the Top Hat Plan was designed to work in concert with a retirement plan that has designated the same entity as the fiduciary (a perfectly legitimate design), the Top Hat Plan could hardly be administered effectively without granting J&J this discretion.

B. Interpreting the Ter ms of J&J's Top Hat Plan

The District Court concluded, and Goldstein has not disputed, that under the language of the Plan documents the Pension Committee was given broad authority to interpret the terms of the Plan and to make final decisions with regard to the payment of benefits. 7 Nonetheless, Goldstein disputes the Committee's interpretation of whether his commissions constituted pensionable compensation, although, as we explained in the r ecitation of facts, his argument as to how his commissions fall under the definition of "Covered Compensation" has taken a variety of forms over the course of this dispute.8 As it is currently presented to us, Goldstein's claim is that, although his commissions were not cover ed under the 1989 version of the Plan, the 1994 changes to the Plan, in particular the deletion of the statement that "All other earnings . . . not specifically described above, are not

_____

7. As described above, the Retirement Plan stated that the Pension Committee had "sole authority" to "interpr et" the plan's terms; the Top Hat Plan incorporated this discretion by r eference when it explained that benefits would be calculated in accordance with the terms of the Retirement Plan. The Top Hat Plan also added a provision that the Pension Committee's decisions in the administration of the Top Hat Plan would be "final and conclusive."

8. Goldstein originally argued that his commissions were pensionable as "incentive or piecework earnings." Later , he claimed that his commissions were "salesperson's commissions" or "sales management incentive compensation," or, in the alter native, that the commissions were "basic remuneration," and that the items enumerated as "basic remuneration" in the Plan were only meant as examples of the types of payments that were pensionable.

17

included in Plan earnings," suggests that the phrase "basic remuneration" was given a broader definition in 1994. In Goldstein's view, the 1994 Plan's list of pensionable items was intended merely to provide examples of the type of compensation covered; because Goldstein's commissions constituted 75% of his earnings, he maintains that the commissions were, in fact, his "basic r emuneration," and therefore are pensionable under the terms of the 1994 Plan.

J&J responds that the list of pensionable ear nings was intended as an exclusive list of all covered items, and that because Goldstein's commissions were not included in the list, they are therefore not pensionable. As explained above, the question presented to the Court is not whether J&J's interpretation offers the best reading of the contract; rather, given the discretion granted to the Pension Committee, the question is whether the interpr etation offered by J&J was reached in good faith. The District Court, after listening to the testimony of the parties and examining the documentary evidence, concluded that J&J's interpretation of the terms of its Plan was reasonable, and that J&J administrators had used their "best ef forts" to interpret the Plan accurately and fairly to assess Goldstein's claim. The District Court's findings are not clearly erroneous.

In reaching its conclusions, the court first relied on its assessment of the credibility of J&J's plan administrators, and specifically found that the members of the Pension Committee and the BCC were not biased in their decisions, and had "exerted their best efforts accurately to interpret the plan and fairly to adjudicate Goldstein's claim." It is axiomatic that we defer to a district court's cr edibility determinations.

Further, we find no fault with the District Court's determination that the numerous "irr egularities" identified by Goldstein in the process by which the administrators interpreted the Plan do not give rise to an inference of bias or bad faith. These alleged irregularities r elate first to the manner by which the Pension Committee delegated its responsibilities to the BCC, and second to what Goldstein perceives as the lack of opportunities for him to present arguments and evidence on his behalf.

18

Goldstein begins by submitting that the Pension Committee never formally delegated authority to the BCC to make benefits determinations, and therefore its decision to "rubber stamp" the BCC decision without reaching its own independent conclusions rendered its interpretation of the Plan terms nugatory. It is true that courts have refused to accord Firestone Tire deference to the decisions of administrators who, in the courts' determination, have failed to exercise the discretion granted to them under the terms of an ERISA plan. See, e.g., Sharkey v. Ultramar Energy Ltd., 70 F.3d 226 (2d Cir. 1995). As we have explained, however, we review here the decision of the administrators not under Firestone Tire standards, but rather to determine whether there has been a violation of the terms of the contract. Therefore, whatever weight Goldstein's arguments on this score might carry in the context of a more ordinary ERISA plan, these arguments are only relevant in the context of a top hat plan to the extent they bear upon compliance with the plan's contractual provisions, including the implied duty of good faith and fair dealing.

In this case, Goldstein's argument that discretionary power was never delegated to the BCC rests on the fact that the formal resolution delegating the Pension Committee's power to the BCC specifically granted the BCC only the authority to "hear and decide claims and appeals." Whether the power to "hear and decide claims and appeals" necessarily carries with it a discretionary power to interpret the terms of the Plan (and it is difficult to see why it would not), any technical flaws in the Pension Committee's efforts to delegate discretion to the BCC do not bear on the issue of good faith. The Plan documents themselves granted the Pension Committee the right to delegate its authority, and the Committee declared its intention to do so in the Summary Plan Description. Additionally, the final disposition of Goldstein's claim was made by the Pension Committee itself in September 1996. Thus, it cannot be said that the delegation to the BCC, and the decision of the Pension Committee to adopt its reasoning, somehow violated the contractual provisions of the Plan granting the Pension Committee the power to interpret the Plan terms, or demonstrated any lack of good faith on the part of J&J.

19

As for Goldstein's second argument, that he was denied an opportunity to make his case before the BCC, the facts simply do not bear him out. He exchanged numer ous letters with J&J employees, including the Chair of the BCC, in which he was able to explain his interpretation of the Plan. In fact, during cross-examination, Goldstein admitted that he had, at one time or another, submitted to the BCC all of the information he believed it needed to reach a determination. Goldstein was informed of the initial BCC meeting, but never asked to attend or to submit evidence. Finally, as the District Court found, Goldstein's claim was reviewed by J&J on at least three separate occasions: during the initial meeting of the BCC, during the course of Goldstein's exchange of correspondence with Car ey, and during the Pension Committee's September 1996 meeting. In the face of this evidence, we see no grounds for concluding that the District Court's finding of good faith on the part of J&J was clearly erroneous.9

_____

9. In a related argument, Goldstein ar gues that no deference is due an administrative interpretation of a Plan unless the claimant is given a "full and fair review" as requir ed by 29 U.S.C. S 1133(2). Because he was not given an opportunity to present evidence and make arguments before the determination was reached, he ur ges us to review the terms of the Plan de novo. Title 29 U.S.C. S 1133(2) is among those enforcement provisions of ERISA from which top hat plans have not been explicitly exempted. However, by its terms, S 1133(2) obligates only "named fiduciaries" –– which are not required for top hat plans –– to conduct a "full and fair review" of a benefits denial. We need not decide today whether S 1133(2) applies to the administrators of top hat plans per se, or whether a "full and fair review" as defined by S 1133(2) is itself a component of good-faith plan administration, because we agree with the District Court that such a review was pr ovided to Goldstein in this case. J&J wrote to Goldstein with updates on his claim for benefits and fully laid out its reasons for denying his claim. It responded to his letters and invited him to call if he had further questions. It identified the specific provisions of the Plan pursuant to which it was premising the denial of benefits. And, as explained above, Goldstein has been unable to identify any "evidence" that he could have submitted that the administrators failed to consider. Thus, J&J fully complied with the strictures we developed in Grossmuller v. Inter national Union, United Automobile Aerospace & Agricultural Implement Workers of America, 715 F.2d 853, 857–58 (3d Cir. 1983), for a full and fair r eview as required by S 1133(2).

In addition to the propriety of the process by which J&J reached its decision, there is no inher ent unreasonableness in the substantive interpretation of the Plan terms offered by J&J giving rise to an inference of bias or bad faith. As written, Goldstein's contract discusses his salary and bonuses in the same section as the discussion of his right to participate in the Plan; his "commissions," in contrast, are placed in a separate section, suggesting that the parties construed these payments to be something other than pensionable earnings.

Further, the contract specifically avers that the commissions were intended to replace other forms of executive compensation such as CECs. As the District Court observed, these forms of executive compensation were not pensionable at the time of the execution of Goldstein's contract, and only some of them became pensionable when they were explicitly added to the list of pensionable earnings in 1994. Thus, it is clear that the phrase "basic remuneration" did not encompass either these alternative forms of compensation, or Goldstein's commissions, in 1989, and the fact that these for ms of executive compensation had to be explicitly added to the list of pensionable earnings in 1994, while the phrase "basic remuneration" remained intact, suggests that there was no "implied" broadening of the definition of "basic remuneration," but instead an expanded list of included items.

Additionally, as the District Court concluded, the phrase "Covered Compensation includes" is r easonably susceptible of meaning either that the earnings listed ar e a "sample" of the types of compensation to be included, or that the phrase "Covered Compensation" is intended to encompass only those forms of compensation explicitly mentioned in the list.10 Thus, there is nothing unreasonable in J&J's

_____

10. We cannot help but observe that Goldstein apparently began offering his alternative construction of the phrase"Covered Compensation includes" only at the time he filed suit in the District Court, and not when he lodged his claim for additional benefits with the Pension Committee. This fact alone suggests that J&J's interpretation is, at minimum, a reasonable one.

21

interpretation of the Plan to cover only those forms of compensation specifically enumerated. And although Goldstein plausibly argues that the 1994 deletion from the Summary Plan Description of the clause excluding for ms of compensation not otherwise specified must be interpreted as evincing an intent to alter the Plan from pr oviding an exclusive list to providing only a "sample" listing, the District Court credited testimony of J&J employees that the phrase had been deleted as surplusage, because the intent all along was to create a list of "cover ed compensation" solely by listing the included items. Certainly, such an interpretation of the motivation for the deletion is not unreasonable either.

Goldstein's position is not an unsympathetic one, and we can understand his anger that, notwithstanding the large sums that his thymopentin patent yielded to J&J (and the fact that he was brought into J&J for his expertise in developing profitable drugs, a skill that might often be rewarded by large royalty-like payments), he was nonetheless given a pension based merely upon his salary. Concomitantly, were we reviewing the plan's terms de novo, we might reach a different r esult. After all, the fact that Goldstein's employment contract specifies that the salary and bonus payments were to be made in lieu of J&J's obligation to market Goldstein's products suggests that it was the commissions -- and not the salary -- that constituted Goldstein's "basic remuneration." But, as the Department of Labor has explained, highly-compensated employees such as Goldstein are well-placed to form employment contracts that protect their inter ests, and in this case, the contract expressly grants the Pension Committee the power to make final determinations as to the types of compensation that are pensionable.

Therefore, we conclude that although courts need not defer to the construction of disputed contract ter ms given by the administrators of top hat plans, effect must be given to all of the terms, including those conferring discretion on the administrators (subject as always to the implied duty of good faith). In this case, the discretion granted to the administrators was quite broad, and ther e is nothing in the process by which J&J reached its decision, or in the

decision itself, that would lead us to conclude that the
District Court's determination as to J&J's good faith was
clearly erroneous. Thus, we conclude that J&J did not
breach its contractual obligation to Goldstein. The
judgment of the District Court will be affir med.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

23