**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-12148

————————————————

JON HOAK,
   on behalf of himself and all those similarly situated,
ANTHONY FANO,
   on behalf of himself and all those similarly situated,
ALLAN QUICK,
   on behalf of himself and all those similarly situated,
PATRICIA GIERING,
   on behalf of herself and all those similarly situated,
NANCY PARIN,
   on behalf of herself and all those similarly situated,

*Plaintiffs-Appellees,*

*versus*

ANDREA LEDFORD, et al.,

*Defendants,*

NCR CORPORATION,
PLAN ADMINISTRATOR OF THE PLANS OF
NCR CORPORATION,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:15-cv-03983-AT

———————————

Before JORDAN and NEWSOM, Circuit Judges, and HONEYWELL,[*] District Judge.

JORDAN, Circuit Judge:

A "top hat" plan is a benefit "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). Such a plan is generally governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1003(a)(1), as a defined benefit plan, *see Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006), but not all aspects of ERISA apply to such plans. *Compare* 29 U.S.C. §§ 1051(2), 1081(a)(3), *with* 29 U.S.C. § 1101(a)(1).

NCR Corporation set up several top hat defined benefit plans subject to certain provisions of ERISA. The plans provided employees the "accrued benefit" of a fixed monthly annuity (based on specific formulas) for life. *See* 29 U.S.C. § 1002(35) (definition of a "defined benefit plan"); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) ("A defined benefit plan . . . consists of a general pool of

---

[*] The Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

assets rather than individual dedicated accounts. Such a plan, 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'") (citation omitted).

The plans' language allowed for termination but included a proviso that "no such action shall adversely affect" the "accrued benefits" of "any" participant, former participant, or beneficiary (whom we'll refer to collectively as participants). In 2013, NCR terminated the plans and paid the participants what it said were actuarially equivalent lump sums. The main question presented in this appeal is whether the lump-sum payments made by NCR to the participants breached the plans' language because they "adversely affected" the "accrued benefits" (i.e., the life annuities) of "any" participant. We agree with the district court that they did and therefore affirm its entry of summary judgment against NCR. *See Hoak v. Plan Adm'r of the Plans of NCR Corp.*, 717 F. Supp. 3d 1280 (N.D. Ga. 2024).

**I**

We exercise plenary review of the district court's summary judgment order. *See Benning v. Comm'r, Ga. Dept. of Corr.*, 71 F.4th 1324, 1328 (11th Cir. 2023); *Metlife Life & Annuity Co. of Conn. v. Akpele*, 886 F.3d 998, 1003 (11th Cir. 2018). Though we view the facts in the light most favorable to the non-moving party in a case involving a summary judgment order, here NCR does not contend that there are any disputes of material fact.

## II

The facts in this class-action lawsuit, which are relatively straightforward, are set out in detail in the district court's order. *See Hoak*, 717 F. Supp. 3d at 1283–91.  We summarize them below.

## A

As relevant here, NCR had five top hat plans.  These plans were to provide for the payment of supplemental retirement, death, and disability benefits to senior executives in order to attract top talent.  The retirement benefits promised under each of the plans were life annuities.  For example, one of the plans stated that "[e]ach Participant shall be entitled to a benefit under this plan expressed as a single life annuity."  So, as the district court explained, NCR "was obligated under the [p]lans to pay [the participants] set monthly payments for life, regardless of how long any particular beneficiary lived."  *Hoak*, 717 F. Supp. 3d at 1297.

The five plans covered a total of 197 participants.  Each of the plans had a provision stating (or similarly stating) that NCR had the "right . . . to terminate" the plan, "provided . . . that (a) no such action shall adversely affect any Participant's, former Participant's, or Eligible Spouse's accrued benefits prior to such action under the Plan . . . and (b) no amendment may be made, to the extent that it would result in a material modification[.]"

In 2006, NCR froze all accruals of additional benefits under four of the plans.  For the other plan, freezing benefits was not necessary because the participants' employment with NCR had already ended.  At the time of the freeze, each participant's "accrued

benefit" was the fixed life annuity already earned and owned by the participant under the terms of the plan in exchange for his or her years of service.

Five years later, in 2011, NCR became concerned about its overall pension liabilities and hired a number of consultants to provide it with guidance. The consultants presented NCR various options in 2012 concerning the top hat plans, which had a present benefit obligation of $126.7 million. First, NCR could issue a lump-sum payment to each participant on a basis chosen by the company (resulting in a total cost of $79.8 million using mortality tables, actuarial calculations, and a 5% discount rate). Second, NCR could purchase new annuities for the participants with a pre-tax monthly benefit equal to a participant's monthly annuity but require the participants to pay the taxes on the premiums for the new annuities. Third, NCR could purchase new annuities for the participants, with NCR paying the taxes on the premiums, resulting in a lower monthly annuity amount for the participants. Fourth, NCR could create an irrevocable trust, place funds in that trust, and have the trust purchase equivalent annuities for the participants. Notes from a meeting of members of NCR leadership indicated, as to the lump-sum option, that lawyers for the participants would argue that their clients should still be able to obtain the same life annuity in the market. The notes also explained that there was "no case" on whether NCR could pass on the longevity risk from itself to the participants.

Ultimately, NCR decided that accrued benefits for the participants in the top hat plans would be disbursed through the lump-sum option. At a meeting in early 2013, NCR's outside counsel explained that the lump-sum option would be "reasonably construed as providing the full benefit entitlement under the [p]lans provided [that] the lump-sum payment is the actuarial equivalent of the annuity benefit." Days later, NCR's Compensation and Human Resources Committee agreed in a unanimous vote with outside counsel's assessment, stating that the lump-sum option "would not 'adversely affect' any accrued benefit if the lump sum is actuarially equivalent to the annuity benefit, using reasonable actuarial assumptions." The Committee also agreed, again unanimously, that 5% was a reasonable discount rate.

On February 25, 2013, NCR, through Committee, approved the termination of the plans. The Committee also declared that the benefits owed to each of the participants would be settled by a lump-sum payment that was the "actuarial equivalent" of the accrued benefit using (a) a 5% discount rate and (b) certain mortality tables and actuarial calculations.

## B

The participants filed a class-action complaint against NCR, the Compensation and Human Resources Committee, Andrea Ledford (NCR's Senior Vice-President and Chief Human Resources Officer), and the plan administrator, asserting a number of claims, including one for breach of contract (i.e., the denial of benefits under the plans). *See* 29 U.S.C. § 1132(a)(1)(B) (allowing a

participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan" or to "enforce his rights under the terms of the plan"). After the district court certified a class for the breach of contract claim, the participants filed an amended complaint, asserting that on this claim they were entitled to replacement annuities or cash sufficient to purchase equivalent replacement annuities.

The district court granted summary judgment in favor of the participants on the breach of contract claim. *See Hoak*, 717 F. Supp. 3d at 1307–08. It ruled that, for reasons we discuss in Part III, a number of participants in the plans were adversely affected by NCR's payment of the lump sums it characterized as actuarially equivalent. *See Hoak*, 717 F. Supp. 3d at 1300–06. The court also concluded that, even if the lump-sum option was generally permissible, NCR breached the language of the plans by using a 5% discount rate to account for its own risk of default. *See id.* at 1306.

In a subsequent order, the district court required NCR to pay the participants (a) "the difference between the lump sums they received and the cost of replacement annuities"—using the Pension Benefit Guaranty Corporation Assumptions in effect as of the termination date (i.e., February 25, 2013), (b) prejudgment interest at a rate of 8.9% on the additional amounts NCR had to pay the

participants, and (c) postjudgment interest at the applicable rate pursuant to 28 U.S.C. § 1961(a). *See* D.E. 237 at 9–26.[1]

The administrator of the plans (whom we refer to as NCR) now appeals.

### III

In most cases under 29 U.S.C. § 1132(a)(1)(B), "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Indeed, ERISA requires that "plans be administered, and benefits be paid, in accordance with plan documents." *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001). *Accord Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990) ("[A]ny retiree's right to lifetime medical benefits at a particular cost can only be found if it is established by contract under the terms of the . . . plan and its benefits.").

We therefore begin with the critical language in NCR's top hat plans. As a reminder, the plans provided that termination was permitted as long as "no such action . . . adversely affect[ed]" the "accrued benefits" of "any" participant.

### A

NCR contends that because the administrator had discretion to interpret the terms of the plans, the district court erred in not

---

[1] The parties resolved some of the other claims, which are not at issue in this appeal.

24-12148               Opinion of the Court                    9

reviewing the administrator's interpretation for abuse of discretion.  We disagree.

It is true that the administrator here had some discretion to interpret the terms of the plan, *see, e.g.,* D.E. 137-7 at 4, and under ERISA such discretion can lead to deferential abuse of discretion review when benefit decisions are challenged.  *See generally Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  But the participants respond that deference is not appropriate when a settlor (like NCR here) terminates a top hat plan under ERISA.  *Compare Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001) (holding that deferential review is not appropriate for administrators of top hat plans because they do not have fiduciary duties: "Given the unique nature of top hat plans, we believe the holding of *Firestone Tire* requiring deferential review for the discretionary decisions of administrators to be inapplicable."), *with Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011) (applying deference where the administrator of a top hat plan was given discretion).

As in *Holloman*, 443 F.3d at 837, we need not decide today who is right about the general applicability of ERISA deference as to the determination or payment of benefits when a top hat plan is terminated.  Even if we assume that a grant of discretion can lead to deferential review of benefits decisions in certain scenarios, such deference is not warranted here given the clear language of the plans.  As we and other circuits have recognized, deference means little under ERISA when the terms or language of the plan are unambiguous: "When plan documents unambiguously address the

substantive rights of the parties at issue, the plan language controls." *Meadows ex rel. Meadows v. Cagle's Inc.*, 954 F.2d 686, 691 (11th Cir. 1992). *See also McCutcheon v. Colgate Palmolive Co.*, 62 F.4th 674, 687 (2d Cir. 2023) ("If a plan's terms are unambiguous, they must be enforced according to those terms without regard for how the plan administrator has otherwise interpreted the language 'because unambiguous language leaves no room for the exercise of discretion.'") (citation omitted); *Thompson v. Ret. Plan for Emps. of S.C. Johnson & Son*, 651 F.3d 600, 608 (7th Cir. 2011) ("[T]he Plans' generalized grant of interpretive discretion did not authorize the administrators to controvert the clear terms of the Plan"); *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 911 (9th Cir. 2001) ("The Committee did not retain the power to redefine the term 'cause' in a way that would undermine Scribner's justified expectations as to what that word meant. Although the Committee had broad discretion to *interpret* the contract, it did not have the authority to *redefine* its terms.").

Consistent with this line of authority, the plans here specified that the administrator's interpretive discretion was limited. They provided that the administrator "shall have no power to add to, subtract from or modify any of the terms" of the plans, "or to change or add to any benefits" provided by the plans. *See, e.g.,* D.E. 137-7 at 5.

At the end of the day, our review of the language in the plans is de novo. That is the same standard that we use to review a district

court's summary judgment order.  *See, e.g., Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014).

## B

Federal courts "'have the authority to develop a body of federal common law to govern the interpretation and enforcement' of plans in ERISA cases.  Under federal common law, we 'first look to the plain and ordinary meaning of the [plan] terms to interpret the contract.'" *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024) (citations omitted).  As we explain below, the language in the plans was unambiguous and did not permit NCR to unilaterally replace the participants' life annuities with what it deemed to be an actuarially equivalent lump sum.

When a plan is terminated, ERISA requires the plan administrator to distribute the assets of the plan.  In doing so, the administrator "shall" either "purchase irrevocable commitments from an insurer to provide all benefit liabilities under the plan," or "in accordance with the provisions of the plan and any applicable regulations, otherwise fully provide all benefit liabilities under the plan." 29 U.S.C. § 1341(b)(3)(A)(i)–(ii).  ERISA thus ensures that "if a worker has been promised a defined pension benefit upon retirement . . . he actually will receive it." *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980).

The plans here did not expressly permit NCR to pay the participants its chosen actuarially equivalent lump sums (with or without a discount rate) upon termination as an alternative to their promised life annuities.  The plans provided only that termination

was permitted so long as "no such action shall adversely affect" the "accrued benefits" of "any" participant. For that reason alone, NCR's reliance on *Holloman* is misplaced; the plans there "specified 'actuarial assumptions' for the [accelerated] payment of benefits, including life expectancy estimates and an assumed 8% discount rate for the payment of benefits." 443 F.3d at 835.

NCR nevertheless argues that its right to terminate the plans allowed it to provide lump-sum payments to those participants whose accrued benefit was a life annuity. For purposes of this appeal, we assume without deciding that NCR is right about this general proposition, particularly given that the participants agree that *some* lump sum could have been paid to them without breaching the language of the plans. For example, the participants acknowledge that NCR could have paid them a lump sum that would have allowed them to purchase, in the market, the same annuities they were promised under the plans. *See* Appellees' Br. at 53–54.

But the general proposition cited by NCR does not resolve this case. The question we must answer is not whether the plans *categorically* prohibited a lump-sum payment (no matter how calculated) to the participants upon termination. It is whether the *precise* lump-sum payments calculated by NCR and paid to the participants breached the language of the plans because they "adversely affect[ed]" the "accrued benefits" (i.e., the life annuities) of "any" participant. *See* Jayne E. Zanglein et al., ERISA Litigation § 25-30 (6th ed. 2017) (noting that "a court will be reluctant to approve a

benefit calculation that appears to discriminate against the plaintiff in a way that contradicts the plan's terms").

## C

The critical language in the plans is unambiguous. First, the term "adversely affect" is a verb phrase which means to "influence[ ] or change[ ] in a negative or harmful way." *Adversely Affected*, Cambridge University Press English Dictionary (2025), https://perma.cc/9R8R-R9US. *Accord Affect Adversely*, Vocab Dictionary (2025) ("To have a negative impact or influence on something."), https://perma.cc/A2DU-6HN6. This understanding is consistent with the meaning of the two words that comprise the term: "adverse" means "causing harm" or "harmful," and "affect" means "to produce an effect upon" or to "effect a change in." *See Adverse & Affect*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020); *Adverse & Affect*, The American Heritage Dictionary of the English Language (4th ed. 2009). Second, the word "any" means "one, some, or all indiscriminately of whatever quantity" or "one, some, every, or all without specification." *Any*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020); *Any*, The American Heritage Dictionary of the English Language (4th ed. 2009). *See also United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (citation omitted). NCR has not offered any other plausible reading of the plans' critical language.

Based upon the ordinary meaning of the terms used, we agree with the district court's reading of the language in the plans.

*See Hoak*, 717 F. Supp. 3d at 1300–01.  We hold that under the plans the lump-sum payments "adversely affect[ed]" the "accrued bene-fits" of "any" participant if the lump sum led to a reduction in the amount of the life annuity of even a single participant.

The district court correctly determined that NCR's lump-sum payments, which were based on mortality tables, actuarial cal-culations, and a 5% discount rate, "adversely affected" the "accrued benefit" of at least some participants in the plans and therefore breached the language of the plans.  Here's why.

When NCR converted the life annuities into the lump-sum payments, it knew that about 50% of the participants would outlive those lump sums if they continued to withdraw the same periodic (i.e., monthly) benefits they were receiving under the annuities (even assuming that the participants earned a 5% return).  *See* NCR's Resp. to Pls.' Statement of Additional Undisputed Material Facts, D.E. 158-1 at 151 ¶ 262 ("Dr. [Ethan] Kra [NCR' actuarial ex-pert] agreed that for participants who receive lump sums, ex ante, half would live longer than average life expectancy according to a mortality table and half would die sooner.").  This evidence, as the district court explained, is fatal to NCR's chosen lump-sum pay-ments:

> In converting [the] beneficiaries' life annuity benefits to lump sum payments, [NCR] necessarily relied on mortality tables and similar actuarial calculations. In-evitably, though, some beneficiaries will live longer than anticipated by the mortality tables. As such, those beneficiaries will have received less money than

24-12148                Opinion of the Court                15

> they would have received by way of the promised life
> annuity. These individuals' "accrued benefits" were
> therefore "adversely affected."

*Hoak*, 717 F. Supp. 3d at 1300. The district court also provided an example of how the lump-sum payments calculated by NCR would "adversely affect" the life annuity (the "accrued benefit") of a participant:

> For an easy and highly simplified example, take a beneficiary whose life annuity was $10,000 a month for the rest of her life, or $120,000 a year. At the time of [p]lan termination, mortality tables expected she had exactly 5 years left to live. So, she received a lump sum of $600,000 ($120,000 x 5), without factoring in a discount rate. However, she ends up living for 10 years after [p]lan termination. With a life annuity, this beneficiary would have received [$]1.2 million . . . (without accounting for a discount rate). Thus, what she received with the time-limited 5-year lump sum was less than what she would have received had she retained her life annuity.

*Id.* at 1300 n.17.

Given the evidence in the record, NCR's reliance on *Holloman* is again misplaced. In *Holloman* the participants failed to present any reliable evidence that their lump-sum payments reduced their accrued benefits under the plan, and that is why summary judgment was properly granted against them. As we explained: "The Hollomans presented no affirmative evidence—such as market annuity prices, or evidence of life expectancy estimates and

discount rates used in the private market—to establish the true present value of the future payments or otherwise show that value of the lump-sum payment fell short of the value of [the] . . . future benefit payments. All that the Hollomans offered were conclusory assertions that Mail-Well had shortchanged them; these broad conclusions standing alone could not have supported a verdict in the Hollomans' favor." 443 F.3d at 840.

In sum, NCR's decision to pay the participants a lump sum based on mortality tables and actuarial calculations constituted a breach of the plans because the lump-sum payments "adversely affect[ed]" the "accrued benefits" (i.e., the life annuities) of at least some (i.e., "any") participants.[2]

## IV

ERISA allowed the participants here to file a civil action "to recover benefits due to [them] under the terms" of the plans and to "enforce [their] rights" under the terms of the plans, *see* 29 U.S.C. § 1132(a)(1)(B), and we have affirmed the district court's ruling that NCR breached the language of the plans through the lump-sum payments it calculated and distributed. "Unsurprisingly, the remedy in a successful action for plan benefits" under § 1132(a)(1)(B) "is to receive the accrued benefits." *Peabody v. Davis*, 636 F.3d 368, 377 (7th Cir. 2011). *See also* Andrew L. Oringer, ERISA: A

---

[2] Given our decision, we need not address the district court's alternative ruling that the 5% discount rate chosen by NCR, and used to calculate the lump-sum payments made to the participants, also constituted a breach of the plans' language.

Comprehensive Guide § 8.03[M] at 8-32 (9th ed. & 2023 supp.) ("As would be expected, the basic remedy available under [§ 1132(a)(1)(B)] is the payment of benefits due under the plan."); Zanglein, ERISA Litigation at § 10-3 ("If a plaintiff prevails on a [§ 11329(a)(1)(B)] claim, generally the appropriate remedy is . . . for the court to require the plan to pay what it was required to pay in the first place under the terms of the plan[.]").

As summarized earlier, the district court ordered NCR to pay the participants "the difference between the lump sums they received and the cost of replacement annuities," using the Pension Benefit Guaranty Corporation Assumptions in effect as of the termination date (i.e., February 25, 2013). As NCR recognizes, these additional payments ensured that the participants would have "enough to purchase a replacement annuity on the private insurance market in 2013." Appellant's Br. at 52. Given that the "accrued benefits" here were life annuities, it seems to us that the remedy chosen by the court correctly allowed the participants to receive those benefits.

NCR, however, argues that the district court should have instead adopted its proposed remedy—the reinstatement of the annuities on a going-forward basis. NCR posits that reinstating the annuities was fairer because private annuities are more valuable and thus more expensive than its own annuities, which were subject to a risk of default. According to NCR, reinstatement would "simply involve subtracting the lump sums [already paid] from the length of time without annuity payments times the rate of those

payments—the difference between the amount paid and the amount that should have been paid." *Id.* at 54 n.14.[3]

Without citing any authority, NCR says our review of the district court's remedy is for abuse of discretion. *See id.* at 20–21. Given NCR's position, we will apply this standard without taking a position on whether it is the correct one.

As we have said many times, the abuse of discretion standard provides a court with a range of choices, and we will not reverse absent a clear error of judgment. *See, e.g., In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994). We reject NCR's challenge for a number of reasons.

First, the district court's remedy is not, as NCR claims, illogical. When it terminated the plans, NCR was told by its consultants that it could purchase new annuities in the market for the participants (with or without the payment of taxes). That is essentially the remedy that the court chose.

Second, the participants say that the termination of the plans had to be "irrevocable" under an ERISA regulation, 29 C.F.R. § 1.409A-3(j)(4)(ix)(C)(3)(5), and as a result reinstatement of the annuities would require the creation of new top hat plans. Although we do not pass on the participants' irrevocability argument today, we note that NCR's only response is that by reinstatement of the annuities it really means to say the "payment of damages" and not

---

[3] NCR does not dispute that the PBGC Assumptions provide a reasonable estimate for replacement-annuity costs.

the reinstatement of the plans. *See* Appellant's Reply Br. at 27. But if that is so, we do not see how NCR's proposal is so demonstrably better that it renders the remedy chosen by the district court an abuse of discretion.

Third, the cases NCR cites in support of its preferred reinstatement remedy did not involve annuities. Nor did they concern top hat plans that had been were terminated. *See Milam v. Am. Elec. Power Long Term Disability Plan*, No. 2:11-cv-77, 2012 WL 5930590, at *4–5 (S.D. Ohio 2012) (long-term disability benefits of a single former employee); *Robertson v. Standard Ins. Co.*, No. 3:14-cv-01572, 2015 WL 13682034, at *3 (D. Or. 2015) (same). Those cases therefore do not help NCR.

## V

NCR's final argument is that the district court erred in awarding the participants prejudgment interest. As NCR sees things, the participants were paid too much and too quickly and did not need prejudgment interest to fully compensate them. Reviewing for abuse of discretion, *see Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1263 (11th Cir. 2008), we again disagree with NCR.

ERISA is silent on the award of prejudgment interest in a § 1132(a)(1)(B) case awarding benefits. The Supreme Court has indicated that, when the relevant federal statute does not speak to the issue, prejudgment interest can be "given in response to considerations of fairness" and "denied when its exaction would be inequitable." *Blau v. Lehman*, 368 U.S. 403, 414 (1962) (internal quotation marks and citation omitted). *See also Woods v. Barnett Bank of Ft.*

*Lauderdale*, 765 F.2d 1004, 1014 (11th Cir. 1985) ("The award of prejudgment interest in a 10b–5 case is governed by standards of fairness and rests within the district court's sound discretion.") (citing *Blau*, 368 U.S. at 414).

As a general matter, "[c]ourts can order the payment of prejudgment interest [under ERISA] when benefits are wrongfully withheld." Oringer, ERISA: A Comprehensive Guide at § 8.03[M] (citing cases). In our view, the district court did not abuse its discretion in awarding prejudgment interest on the amounts that NCR was ordered to pay over and above the lump-sum payments it made when the plans were terminated. As the participants correctly explain, "[h]ad NCR properly terminated, [they] would have received replacement-annuity premiums in 2013." Appellees' Br. at 55. In other words, the additional amounts that the district court ordered NCR to pay due to its breach were sums that the participants should have had (or should have had access to) in 2013, but were deprived of for about a decade. *See generally Interest(3)*, Black's Law Dictionary (12th ed. 2024) (explaining that interest is "compensation . . . allowed by law . . . for the loss of money by one who is entitled to its use").

## VI

We affirm the district court's judgment in favor of the participants.

**AFFIRMED.**