954 F.2d 686
 60 USLW 2576, 14 Employee Benefits Cas. 2513
 Cindy Kay MEADOWS, By and Through her guardian and the
conservator of her Estate Jackie MEADOWS, Plaintiff-Appellee,
v.
CAGLE'S, INC., Defendant-Appellant,
Liberty Mutual Insurance Co., Defendant,
Cagle's, Inc. Medical Benefit Plan; Liberty Life Assurance
Company of Boston, Defendants-Appellants.
Cindy Kay MEADOWS, By and Through her guardian and the
conservator of her Estate Jackie MEADOWS,
Plaintiff-Appellant,
v.
CAGLE'S, INC., Liberty Mutual Insurance Company, Cagle's,
Inc. Medical Benefit Plan, Liberty Life Assurance
Company of Boston, Defendants-Appellees.
 Nos. 90-7826, 91-7086 and 91-7224.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 28, 1992.
 
 Lange, Simpson, Robinson & Somerville, Duncan B. Blair, Birmingham, Ala., Anthony J. McGinley, Michael A. Coval, Carter & Ansley, Atlanta, Ga., for defendant-appellant in No. 90-7826 and defendants-appellees in No. 91-7086.
 Douglas I. Friedman, S. Lynne Stephens, John M. Pennington, Eddie Leitman, Leitman, Siegal, Payne & Campbell, PC, Birmingham, Ala., for plaintiff-appellee in No. 90-7826 and plaintiff-appellant in Nos. 91-7086 and 91-7224.
 Michael Coval, Carter & Ansley, Atlanta, Ga., for defendants-appellees in No. 91-7224.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before JOHNSON*, CLARK * and PECK**, Senior Circuit Judges.
 JOHNSON, Senior Circuit Judge:
 
 
 1
 This case arises on appeal following the district court's holding that Cagle's, Inc. (Cagle's) and Liberty Life Assurance Company of Boston (Liberty Life) remain liable under certain provisions of the Comprehensive Budget Reconciliation Act of 1986 (COBRA) for medical expenses incurred by Mrs. Cindy Meadows[1] despite her husband's ostensible waiver of COBRA continuation coverage. Also presented for decision is an appeal by Mr. Meadows of the district court's denial of an award of attorneys' fees.
 
 I. STATEMENT OF THE CASE
 A. Background Facts
 
 2
 Cindy Kay Meadows was an employee of Cagle's, a chicken processing plant in Alabama. Cagle's provided Mrs. Meadows with health insurance coverage under a company-sponsored plan administered and partially underwritten by Liberty Life.
 
 
 3
 Mrs. Meadows is presently in a persistent vegetative state. She suffered a series of strokes in the autumn of 1988 and has been hospitalized ever since. Meadows is catatonic and usually fails to respond to stimuli. Moreover, she has sustained extensive brain damage and will probably never return to a normal life. Presently, Mrs. Meadows is hospitalized at the New Medico Neurologic Rehabilitation Center of the Gulf Coast in Slidell, Louisiana.
 
 
 4
 After retaining Mrs. Meadows on their payroll for one year, Cagle's discharged Mrs. Meadows on August 1, 1989. Meadows was automatically eligible for continued health care coverage for twelve months under the terms of the Cagle's-Liberty Life plan. However, under provisions of COBRA, Mrs. Meadows could continue her coverage with Liberty Life for at least an additional eighteen months, provided that she pay the plan premiums for her coverage. On August 4, 1989, Cagle's mailed Mrs. Meadows her statutorily required notice informing her of her rights under COBRA to continued health insurance coverage under Cagle's plan with Liberty Life.[2] Jackie Meadows, Cindy Meadows' husband, opened and read the letter. Mr. Meadows then contacted Cagle's insurance clerk, Darlene Sharp, to determine what the COBRA notice meant. There is substantial disagreement between Sharp and Mr. Meadows as to what each said to the other regarding the COBRA notice.
 
 
 5
 Sharp claims that she told Mr. Meadows that she did not know if the coverage offered under COBRA was for any additional illnesses or whether it also related to Mrs. Meadows' current health problems. Sharp testified that she told Mr. Meadows that she would talk with Liberty Life's representatives to determine whether he needed to elect coverage to prolong Mrs. Meadows' covered treatment. Sharp also claimed in her sworn testimony that after talking with Liberty Life, she told Mr. Meadows that he needed to elect the COBRA coverage in order to secure eighteen months of coverage in addition to the twelve months that was already contractually guaranteed. Sharp testified that she explained to Mr. Meadows that if he did not elect the COBRA coverage and pay the $96 per month premiums, Mrs. Meadows' health insurance coverage for any and all illnesses would continue for only twelve months, running from the date of her discharge from Cagle's.
 
 
 6
 Mr. Meadows testified that Sharp never clearly explained to him that electing the COBRA coverage was necessary in order to continue receiving benefits up to the $1 million policy limit. Rather, Meadows testified that he understood that the policy guaranteed $1 million in guaranteed benefits for Mrs. Meadows' existing health problems without any additional premium payments and, thus, that it was unnecessary to elect the COBRA coverage.
 
 
 7
 In addition, Cathy Ward, a nurse and agent for Liberty Mutual (a company affiliated with Liberty Life), told Mr. Meadows that when choosing a long-term caregiver for Mrs. Meadows he should try to "stretch" the $1 million to achieve the maximum period of care. The lower court found that Ward's statements suggested to Mr. Meadows that Mrs. Meadows enjoyed $1 million in vested benefits.
 
 
 8
 If either Cagle's or Liberty Life had provided Mr. Meadows with the official plan documents, which would have made clear that the policy did not guarantee $1 million in coverage without an affirmative election of COBRA benefits, then this confusion could have been entirely avoided. However, neither Cagle's nor Liberty Life ever provided Mr. Meadows with the official plan documents. Absent the plan documents, Mr. Meadows could not have independently evaluated whether he needed to elect COBRA coverage on behalf of his wife. In November 1989, Mrs. Meadows' option to elect coverage under COBRA lapsed. The twelve months of guaranteed coverage under the Cagle's-Liberty Life plan for disabled, discharged employees began to run in August 1989. Thus, as of November 1989, Mrs. Meadows had only nine months of continued coverage. Had Mr. Meadows elected to exercise Mrs. Meadows' COBRA rights, Mrs. Meadows' coverage could have continued for at least an additional eighteen months, subject to the $1 million maximum benefit cap.
 
 
 9
 On July 23, 1990, seven days before Mrs. Meadows' insurance coverage would lapse, Mr. Meadows was formally appointed her legal guardian. Mr. Meadows then attempted to exercise affirmatively Mrs. Meadows' COBRA rights. Liberty Life refused to give effect to the July COBRA election, asserting that Mrs. Meadows had waived her COBRA rights through Mr. Meadows' failure to elect them by November 4, 1989.
 
 B. Procedural History
 
 10
 On August 10, 1990, the lower court granted Mr. Meadows' motion for a preliminary injunction against Liberty Life and Cagle's, requiring them to continue Mrs. Meadows' insurance coverage under COBRA pending trial. On September 26, 1990, after a bench trial, the lower court granted an injunction effective until January 13, 1991. The district court held that Mr. Meadows' July 1990 COBRA election was effective, and that so long as he paid Liberty Life the $96 premium per month prospectively for the balance of the COBRA coverage period, Mrs. Meadows was entitled to the full eighteen months of COBRA continuation coverage, with the twelve additional months of coverage guaranteed under the plan to run concurrently with the COBRA benefit period. The district court, ostensibly relying on Cruzan v. Director, Missouri Dep't of Health, --- U.S. ----, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), held that a guardian must be formally appointed before a COBRA election declining benefits may be made for an incompetent beneficiary. The lower court reasoned that, although Mr. Meadows could have elected to accept COBRA continuation rights on Mrs. Meadows' behalf without being formally appointed her guardian, Mr. Meadows could not forego Mrs. Meadows' COBRA rights unless he was formally appointed to be her guardian. The lower court also held that by failing to obtain a valid COBRA waiver, Liberty Life had waived any claim to any back premiums. On November 9, 1990, the district court amended its final order, holding that the twelve months of contractually guaranteed coverage would not run concurrently with the COBRA coverage period, but rather would run following the expiration of Mrs. Meadows' COBRA coverage. Under the lower court's November 9 order, Mrs. Meadows' coverage with Liberty Life would continue until January 13, 1992.
 
 
 11
 On December 4, 1990, Mr. Meadows' attorneys filed a motion for an award of attorneys' fees. In an order of December 27, 1990, the lower court denied the motion for an award of attorneys' fees because the motion was untimely under the local rules of court. On January 9, 1991, the lower court denied Mr. Meadows' motion for reconsideration of its December 27, 1990 order.
 
 
 12
 Cagle's and Liberty Life now appeal the lower court's judgment in favor of Meadows. Mr. Meadows appeals the lower court's decision to deny him an award of attorneys' fees.
 
 II. ANALYSIS
 
 13
 Appellants Cagle's and Liberty Life raise two arguments on appeal. First, Cagle's and Liberty Life argue that the lower court erred in finding that Mr. Meadows had to be formally appointed Mrs. Meadows' legal guardian before he could make a binding waiver of her COBRA benefits. Second, Cagle's and Liberty Life argue that they cannot be estopped from denying COBRA continuation coverage based on their representations to Mr. Meadows.
 
 
 14
 Mr. Meadows contends that his formal appointment as Mrs. Meadows' legal guardian was a prerequisite to his waiver of Mrs. Meadows' COBRA rights. He also argues that Liberty Life and Cagle's should be estopped from denying his wife up to $1 million in coverage based on their representations to him.
 
 
 15
 We reject Mr. Meadows' estoppel arguments, and agree with Cagle's and Liberty Life that Mr. Meadows could not rely on their oral representations to him to the extent those representations were inconsistent with the terms of the plan contained in the summary plan descriptions. However, we also find that the question of whether Mr. Meadows' formal appointment as Mrs. Meadows' legal guardian was a prerequisite to a valid waiver of her COBRA rights is overshadowed by a more fundamental problem: the failure of Cagle's and Liberty Life to provide Mr. Meadows with the information necessary for him to evaluate whether he should elect COBRA coverage for his spouse. Neither Cagle's nor Liberty Life provided Mr. Meadows with a summary plan description (SPD) of the Cagle's plan, the only source of information about the Cagle's plan upon which Mr. Meadows could place reliance. We find this issue dispositive of the case before us.
 
 
 16
 A. Conversations between Liberty Life's agent and Mr. Meadows did not work an estoppel on Liberty Life
 
 
 17
 Mr. Meadows urges this Court to affirm the result reached by the district court based on his argument that misrepresentations by Cagle's and Liberty Life estopped the insurer from denying him, as Mrs. Meadows' duly appointed guardian, the right to elect COBRA coverage on behalf of his wife in July 1990, whereas appellants Cagle's and Liberty Life contend that this Court may not impose liability based on an estoppel theory. The district court rejected liability based on estoppel in its opinion of September 26, 1989.
 
 
 18
 The oral representations of a plan administrator cannot alter or change the terms of the plan. Nachwalter v. Christie, 805 F.2d 956, 960-61 (11th Cir.1986). Although oral interpretations of written plan provisions may estop an insurer from later denying its earlier interpretation of a particular plan provision, Kane v. Aetna Life Ins., 893 F.2d 1283, 1285-86 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990), the facts of this case do not involve the interpretation of an ambiguous plan provision. Cf. National Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta, Inc., 929 F.2d 1558, 1571-72 (11th Cir.1991) (allowing application of federal common law estoppel to representations about COBRA rights statutorily included in all ERISA-covered plans). Mr. Meadows claims that he was told that the $1 million figure represented vested benefits, regardless of how long it took to expend them. However, the plan documents clearly stated that the $1 million figure represented the maximum benefit that would be paid on the policy, not the amount vested upon injury.[3] When plan documents unambiguously address the substantive rights of the parties at issue, the plan language controls, absent a showing of intentional fraudulent promises by the insurer in informal communications with the insured. Alday v. Container Corp. of America, 906 F.2d 660, 666 & 666 n. 15 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991).
 
 
 19
 The trial court did not find that Liberty Life intended to deceive Mr. Meadows, but rather found that Liberty Life merely failed to communicate the plan's terms clearly to Mr. Meadows. Moreover, Mr. Meadows has not presented any evidence to this Court that would support a holding by this Court that the lower court's factual finding on this issue was clearly erroneous. Fed.R.Civ.P. 52(a). On the facts before us, Alday and Nachwalter are controlling. Consequently, Cagle's and Liberty Life could not be estopped from denying Mrs. Meadows an additional eighteen months' coverage under COBRA.
 
 
 20
 B. Liberty Life should have provided Mr. Meadows with plan documents explaining the terms and conditions of Mrs. Meadows' health insurance
 
 
 21
 COBRA provides that employers must allow former employees the opportunity to continue health care coverage under the employer's plan if a qualifying event occurs. 29 U.S.C.A. § 1161 (West Supp.1991). Discharge from employment is a qualifying event. 29 U.S.C.A. § 1163(2) (West Supp.1991). After a qualifying event, employers must provide notice to employees of their COBRA rights and allow employees at least sixty days to decide whether or not to elect COBRA continuation coverage. 29 U.S.C.A. § 1165(1) (West Supp.1991). This Court must decide, as a matter of first impression and with no guidance from other courts, what is required of an insurer to discharge its responsibility under section 1166 to provide qualified beneficiaries notice of their COBRA rights when a beneficiary is incompetent.
 
 
 22
 As an initial matter, we hold that for a section 1166 notice to be effective, the notice must be sent to a person not only legally capable of acting on the notice, but also capable of acting intelligently on it.[4] The drafters of section 1166 reasonably assumed that in most circumstances the person most capable of making a COBRA election is the beneficiary, see 29 U.S.C.A. § 1165 (West Supp.1991), and therefore provided that the beneficiary is the person to whom a section 1166 notice should be sent. In the case at bar, however, the beneficiary's medical condition prevents her from making a COBRA election. In such circumstances, we hold that a COBRA notification is effective for purposes of complying with section 1166 of Title 29 only if it is mailed to a person capable of making, and willing to make, an informed decision regarding the election of COBRA continuation coverage on behalf of the incompetent beneficiary. If Mr. Meadows was not capable of acting on the August 1989 COBRA notice for any reason, then the notice was ineffective, and Cagle's and Liberty Life will be required to provide adequate notice.
 
 
 23
 ERISA requires that all plan beneficiaries be provided with copies of documents explaining plan benefits.[5] Cagle's provided Mrs. Meadows with a copy of the summary plan description and other plan materials when she enrolled in the Cagle's-Liberty Life plan. However, Mr. Meadows was never provided with these documents.[6]
 
 
 24
 After careful examination of the question, we conclude that Cagle's and Liberty Life had an obligation to provide Mr. Meadows (or whoever was to serve as Mrs. Meadows' surrogate) with copies of the official plan documents contemporaneously with the COBRA notice in order to allow him to make an informed decision on behalf of Mrs. Meadows.[7] Under normal circumstances, the person making a COBRA election will be the employee-beneficiary, who already will possess the requisite materials. However, it is highly unlikely that a spouse, other relative, or unrelated legal guardian acting for an incompetent beneficiary will likewise have access to the current plan documents. Congress clearly intended that plan beneficiaries would have access to official plan documents. See 29 U.S.C.A. § 1024(b)(1) (1985); id. at § 1021(a); id. at 1022(a). This Circuit's rejection of oral modifications to plan documents reflects both the Court's and Congress' shared concern for ensuring that beneficiaries are fully and clearly apprised of their rights and obligations under an ERISA-covered plan. See St. Joseph's Hospital, 929 F.2d at 1573-74. It necessarily follows that a person who is to make a COBRA election on behalf of an incompetent beneficiary should have the same information that would normally be available to the beneficiary, and we conclude that this approach is necessary if the Court is to give full effect to both the disclosure requirements provided in sections 1021, 1022, and 1024 of ERISA, and the notice requirement established by section 1166 of COBRA.
 
 
 25
 Simply stated, a section 1166 notice to a surrogate decider is of little use unless the recipient is contemporaneously provided with copies of the official plan documents. Therefore, plan administrators must provide current section 1024 documents with section 1166 notices when attempting to discharge section 1166's notice requirement through an incompetent beneficiary's surrogate. A notice of COBRA rights and the plan information described in section 1024 together constitute proper COBRA notice for an incompetent beneficiary's surrogate decider.
 
 
 26
 Applying the foregoing to the case at bar, we conclude that Mr. Meadows' waiver of his wife's COBRA benefits in November 1989 was void. The attempted COBRA notice provided to Mr. Meadows in August 1989 did not discharge the duty section 1166 imposed on Cagle's and Liberty Life because Mr. Meadows was not provided with the plan documentation described in section 1024. Mr. Meadows' July 1990 COBRA election was also void. The record does not indicate that Mr. Meadows ever received any plan documents, much less that he received them contemporaneously with a COBRA notice prior to the time he made his second COBRA election in July 1990. Thus, Cagle's and Liberty Life have never provided Mr. Meadows with proper section 1166 notice. Only after they have provided proper notice will they have discharged their duties under section 1166.
 
 
 27
 Once Cagle's and Liberty Life provide Mr. Meadows, Mrs. Meadows' legal guardian, with proper notice of his wife's COBRA rights to continued coverage under the Cagle's plan, Mr. Meadows will have sixty days after receipt of the notice letter and plan documents in which to make a valid COBRA election on behalf of his wife, with COBRA continuation coverage running retroactively from the time of the qualifying event. 29 U.S.C.A. § 1165(1)(C)(ii) (West Supp.1991); id. at § 1166(a)(4).
 
 
 28
 Finally, we find that a remand is necessary in this case for two reasons. The district court's reasons for holding that January 13, 1991 was the latest possible date for COBRA continuation coverage are less than clear, and the district court's waiver of back-premiums seems to lack a legal basis.
 
 
 29
 Neither the district court's order of September 26, 1990, nor the order of November 9, 1990 explains why the lower court selected January 13, 1991 as the date on which COBRA continuation benefits would expire. The September 26, 1990 opinion references a memorandum from Cagle's and Liberty Life's attorneys (presumably incorporating it by reference) that, after discussing the application of section 1162(2)(A) and section 1162(2)(D)(ii), flatly concludes that January 13, 1991 is the latest possible date that Mrs. Meadows could continue her health care coverage under COBRA. Presumably, January 13, 1991 is the date that Mrs. Meadows became eligible for benefits under Title XVIII of the Social Security Act [42 U.S.C.A. § 1395 et seq.]. See 29 U.S.C.A. § 1162(2)(D)(ii) (West Supp.1991). Eligibility for Medicare benefits triggers the application of section 1162(2)(D)(ii), ending the period of COBRA continuation coverage. However, the district court did not make a factual finding on the record that Mrs. Meadows became eligible for Medicare benefits on January 13, 1991.[8] Although it appears that both the lower court and the parties assumed that August 13, 1988 was the date on which Mrs. Meadows became disabled for purposes of determining Medicare eligibility pursuant to section 1162(2)(D)(ii), the lower court failed to make any factual findings on this matter.
 
 
 30
 This Court cannot assume a fact not in the record. We therefore will require the lower court on remand to enter on the record a factual finding regarding the date on which Mrs. Meadows became disabled for purposes of Medicare eligibility.[9]
 
 
 31
 Second, although Cagle's and Liberty Life do not appeal the lower court's holding that Liberty Life effectively waived payment of the plan premiums from August 1989 to July 1990, we are unsure of the legal basis for the district court's holding. Because Liberty Life did not appeal this issue, we review this ruling sua sponte for plain error. We are not convinced that the lower court's holding on this issue did not constitute plain error. Therefore, we also remand this issue to the district court so that the lower court may explain the legal basis for its action or, alternatively, require Mr. Meadows to pay all of the back premiums. See 29 U.S.C.A. § 1162(2)(C) (West Supp.1991) (plan coverage ceases if beneficiary does not pay premium, strongly suggesting that the payment of required premiums is a condition of COBRA continuation coverage). See also id. at § 1162(3).
 
 
 32
 C. The district court's denial of attorneys' fees was proper
 
 
 33
 Mr. Meadows appeals the lower court's denial of his motion for an award of attorneys' fees. Meadows asks this Court to hold that the lower court abused its discretion by denying his request for an award of attorneys' fees. Section 1132(g) of Title 29 authorizes district courts to award attorneys' fees in ERISA litigation. However, local Rule 54.1 of the Northern District of Alabama requires that motions for attorneys' fees be filed "within twenty days after entry of the judgment." Appellant Meadows did not file his request for attorneys' fees within the period required by the local rule.
 
 
 34
 We affirm the district court's denial of an award of attorneys' fees for failure to comply with the local rules because such denial did not constitute an abuse of discretion. Insofar as the district court was merely enforcing a local rule of court, this Court cannot understand how the lower court's ruling reflects "a clear error of judgment." Balogh's of Coral Gables, Inc. v. Getz, 798 F.2d 1356, 1358 (11th Cir.1986) (en banc) (citation omitted). Counsel's representation of Mr. and Mrs. Meadows is, of course, laudatory. However, failing to award attorneys' fees on the instant facts will not discourage future ERISA litigants from asserting their rights under ERISA-covered plans, but rather will serve to put attorneys on notice that filing deadlines must be observed.[10] Meadows' attorneys would have been entitled to attorneys' fees under section 1132 had they complied with the rules of court. The district court was under no obligation to waive or ignore the local rules regarding requests for attorneys' fees. For the foregoing reasons, the decision of the district court denying attorneys' fees must be affirmed.
 
 III. CONCLUSION
 
 35
 The opinion of the district court is AFFIRMED in part and REVERSED in part. The case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 Although Mrs. Meadows is the party at interest, references in this opinion will be to her legal guardian, Mr. Meadows
 
 
 [2]
 Cagle's mailed this notice not to Mrs. Meadows' last known address (the New Medico facility in Slidell, Louisiana), but rather to her husband's last known address. We note that the plan at issue in this case requires that the plan administrator mail COBRA notices to the "last known residence address" of the beneficiary. However, we concur with the district court's conclusion that mailing the COBRA notice to Mrs. Meadows in care of Mr. Meadows complied with this term of the plan
 
 
 [3]
 The summary plan description provided:
 General Maximum--The total benefits payable under the Basic and Major Medical provisions of the Plan for all charges incurred by an individual will not exceed a lifetime maximum of $1,000,000.
 Summary Plan Description, at 25.
 
 
 [4]
 Because state law is preempted and ERISA does not expressly address how incompetent beneficiaries are to be served notice of their COBRA rights, this Court must fashion federal common law rules to address this circumstance. Nachwalter, 805 F.2d at 959
 
 
 [5]
 "The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary, plan description, and all modifications or changes...." 29 U.S.C.A. § 1024(b). See also 29 U.S.C.A. § 1022(a) (1985) (setting out the requirements for summary plan descriptions)
 
 
 [6]
 The record indicates that some plan documents happened to be among Mrs. Meadows' personal effects, although it is unclear whether the plan documents among Mrs. Meadows' papers were current. However, neither Cagle's nor Liberty Life ever directly provided Mr. Meadows with current plan documents
 
 
 [7]
 Because this issue is dispositive of the case before us, we need not (and do not) decide whether Mr. Meadows had to be formally appointed Mrs. Meadows' legal guardian in order for the COBRA notice to be effective
 
 
 [8]
 It appears that the lower court assumed that Mrs. Meadows became disabled on August 13, 1988, the date twenty-nine months prior to January 13, 1991. In order to qualify for Medicare benefits, one must complete a twenty-nine month waiting period. 42 U.S.C.A. § 426 (1983 & West Supp.1991); id. at § 423
 
 
 [9]
 We note that section 1162(2)(A)(i) provides the proper COBRA continuation coverage period, giving Mrs. Meadows eighteen months of continuation coverage from the date of her discharge, see id. at § 1162(2)(A)(i), unless the "qualified beneficiary" provided notice to the plan administrator that Mrs. Meadows had been determined to be disabled under Title II or XVI of the Social Security Act. If the plan administrator was provided such notice within eighteen months of the event qualifying the beneficiary for COBRA coverage, then the period of COBRA coverage would be twenty-nine months after the date of discharge. 29 U.S.C.A. § 1162(2)(A) (West Supp.1991). On the facts of this case, Mrs. Meadows was incapable of providing such notice. Therefore, we hold that if Mr. Meadows (or anyone acting on behalf of Mrs. Meadows) provided notice to the plan administrator that Mrs. Meadows had been determined to be disabled for purposes of Title II or XVI of the Social Security Act within the eighteen month period running from August 1989 to January 1991, such notice was sufficient to trigger the application of the twenty-nine month COBRA continuation coverage period set forth in section 1162(2)(A). Of course, regardless of whether the potential ending date was eighteen or twenty-nine months after discharge, COBRA continuation coverage would have to end when Mrs. Meadows became entitled to Medicare benefits under Title XVIII of the Social Security Act. Id. at § 1162(2)(D)(ii). Thus, in order to calculate properly the duration of the COBRA continuation period, the lower court must establish the date on which Mrs. Meadows became eligible for benefits under Title XVIII of the Social Security Act (42 U.S.C.A. § 1395, et seq.), and, if necessary, determine whether the eighteen or twenty-nine month coverage period applied
 
 
 [10]
 Although Local Rule 54.1 took effect October 15, 1990, in the midst of the litigation, Local Rule 11 mandated the same result, and was in effect until October 15th. Thus, under either Local Rule 11 or 54.1, counsel were on notice that any motion for attorneys' fees had to be filed within 20 days of the final judgment. Moreover, the local rules required only the filing of the motion--supporting documentation and memoranda could be filed within fifty (50) days of the judgment, so long as the attorneys filed the initial motion for fees within 20 days