[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 27, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10850

_____

D. C. Docket No. 03-02635-CV-BBM-1

OTIS J. HOLLOMAN,
JONELLA HOLLOMAN,

Plaintiffs-Appellants,

versus

MAIL-WELL CORPORATION,
as Successor in Interest to
Curtis 1000, Inc., an American
Business Products Inc. Company,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 27, 2006)

Before DUBINA and MARCUS, Circuit Judges, and GOLDBERG[*], Judge.

_____

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade,
sitting by designation.

MARCUS, Circuit Judge:

Appellants Otis J. Holloman and Jonella Holloman appeal from the district court's order of final summary judgment entered in favor of appellee Mail-Well Corp. ("Mail-Well") on their claims brought under the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1101–1114. After thorough review, we conclude that the district court correctly granted final summary judgment on the Hollomans' claims. Moreover, we are unpersuaded by appellants' claim that the district court abused its discretion when it denied their motions to compel discovery. Finally, we lack jurisdiction to consider an appeal by the Hollomans' attorney, Christopher Vaughn, challenging a sanctions order to pay attorneys' fees and accordingly dismiss that issue from the appeal.

I

The essential and undisputed facts in this case are these: Otis Holloman worked for Curtis 1000, Inc., an American Business Products, Inc., ("ABP") company, from 1948 until he retired in 1991. Holloman joined two retirement plans that ABP offered to certain key executives as a retention incentive. He joined the ABP Supplemental Retirement Income Plan on June 5, 1984, and joined the ABP Deferred Compensation Investment Plan on June 30, 1985.

On both plans, Holloman elected a "Last Survivor Option." Under this

2

option, Holloman would receive lower monthly benefit payments, but those payments, instead of ending at Holloman's death, would continue to his spouse for the rest of her life if she outlived him. Mail-Well claims this survivor benefit only applied to Otis Holloman's wife at the time, who was Katherine Holloman. The Hollomans say that the survivor benefit also applies to Otis Holloman's current wife, Jonella Holloman.

Each plan granted authority to the ABP board to amend the plan terms but restricted that authority by providing that no amendment could reduce the benefits to be paid to a participant. In 1990, ABP amended the plans so that each provided that in the event of a change in control, the plan trustee would have "sole authority to construe and determine the effects of the provisions of the Plan." On July 9, 1990, ABP entered an agreement naming the First National Bank of Atlanta -- now Wachovia -- as the plan trustee for both plans.

In 1991, Holloman retired and began receiving monthly joint and survivor annuity payments. In November 1994, his wife, Katherine Holloman, died. Otis Holloman then married Jonella Holloman on November 5, 1995. The Hollomans claim that shortly thereafter, at a company Christmas party in December 1995, and again in a later telephone conversation, a Curtis 1000 human resources representative assured the Hollomans that Jonella Holloman would receive the

same benefits that Katherine Holloman was to have received.

On July 7, 2000, the defendant, Mail-Well, acquired ABP. In 2001, Mail-Well decided to accelerate payment of benefits under the plans. Mail-Well consulted with its legal counsel, and obtained approval for the acceleration from Wachovia, the plan trustee, and the Mail-Well board of directors. The plans specified "actuarial assumptions" for the payment of benefits, including life expectancy estimates and an assumed 8% discount rate for the payment of benefits, but they did not include specific instructions or actuarial assumptions for making accelerated lump-sum payments. Mail-Well had an outside consulting firm, Mercer Human Resources Consulting, calculate the accelerated payments based on actuarial tables that approximately matched the life expectancy estimates used to calculate benefits.

Otis Holloman received notice of the acceleration on August 29, 2001. Without Holloman's consent, Mail-Well paid him a lump-sum payment of $436,443.00, which came out to $315,421.17 after taxes were withheld. Holloman's payment did not include any amount reflecting survivor benefits to be paid to Jonella Holloman if she survived Otis Holloman.

On May 9, 2003, the Hollomans commenced suit in the Superior Court of Fulton County, Georgia, for breach of contract, alleging specifically that Mail-Well

had breached its contractual obligations by accelerating payments without majority approval from the ABP board of directors, discounting payments, and denying benefits to Jonella Holloman. Mail-Well removed the case to the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1441, contending that the plaintiff's contract claims were preempted by the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1101–1114, whose civil enforcement provisions completely displace analogous state law claims.[1] The plaintiffs then moved to remand the cause to state court, but the

_____

[1]The doctrine of complete preemption permits federal question removal of ERISA claims pleaded as state law claims. Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 66–67 (1987); Kemp v. Int'l Bus. Machs. Corp., 109 F.3d 708, 712 (11th Cir. 1997). ERISA § 502(a), 29 U.S.C. § 1132, allows private civil enforcement actions by plan participants. The provision reads:

§ 1132. Civil enforcement

(a) Persons empowered to bring a civil action

A civil action may be brought--

(1) by a participant or beneficiary--

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce is rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

district court denied that application on November 17, 2003.

Soon thereafter, and with leave of court, the plaintiffs amended their complaint stating claims under ERISA. The amended complaint specifically alleged that Mail-Well's actions amounted to failure to pay benefits (Count I), and interference with benefits (Count II), and that Mail-Well's modification of the benefit plans without a majority vote amounted to a breach of fiduciary duty (Count III). The plaintiffs sought declaratory relief, injunctive relief, compensatory

---

> violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
>
> (4)    by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title;
>
> . . .

29 U.S.C. § 1132.

ERISA § 409, 29 U.S.C. § 1109, provides:

§ 1109. Liability for breach of fiduciary duty

(a)    Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

(b)    No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109.

6

and punitive damages, and attorney's fees and costs.

The plaintiffs and defendant filed cross motions for summary judgment, and on January 24, 2005, the district court granted final summary judgment in favor of the defendants. The Hollomans timely brought this appeal.

II

The Hollomans argue first that the district court erred in granting final summary judgment. They also say that the district court erred in denying their motions to compel discovery.

We review a district court's grant or denial of summary judgment de novo. Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005). We consider only the evidence that was available to the district court at the time it considered the motion. Welch v. Celotex Corp., 951 F.2d 1235, 1237 n.3 (11th Cir. 1992). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Bochese, 405 F.3d at 975.

When reviewing a district court's denial of a motion to compel discovery, we apply an abuse of discretion standard. Sanderlin v. Seminole Tribe of Fla., 243

F.3d 1282, 1285 (11th Cir. 2001) (citing <u>Burger King Corp. v. Weaver</u>, 169 F.3d 1310, 1320 (11th Cir. 1999)). This means that a district court is allowed "a range of choice" in such matters, and we will not second-guess the district court's actions unless they reflect a "clear error of judgment." <u>United States v. Kelly</u>, 888 F.2d 732, 745 (11th Cir. 1989).

III

The Hollomans' main argument is that the district court incorrectly granted final summary judgment for the defendants based on its conclusion that the Hollomans had failed to present sufficient evidence to take the case to trial. The plaintiffs offer three reasons: first, that the plans did not allow Mail-Well to distribute Otis Holloman's benefits in a one-time lump-sum payment; second, that the one-time lump-sum payment in essence amounted to a reduction in benefit payments in violation of the express terms of the plans; and, finally, that the lump-sum payment failed to account for the joint and survivor annuity payments Jonella Holloman was to receive if she outlived Otis Holloman.

All of the parties maintain, and we agree, that both of the retirement plans at issue are "top hat" plans for purposes of ERISA. A top hat plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated

8

employees," 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are subject to ERISA, 29 U.S.C. § 1003(a), but notably, they are excluded from many individual ERISA provisions on the basic assumption that high-level employees are in a "strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees." Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001); see also 29 U.S.C. § 1051(2) (excluding top hat plans from participation and vesting provisions); id. § 1081(a)(3) (excluding top hat plans from funding provisions); id. § 1101(a)(1) (excluding top hat plans from fiduciary liability provisions).

There is some uncertainty about what standard of review a district court should apply when reviewing decisions made by the administrator of a top hat plan. The district court observed that it was following a Third Circuit case, Goldstein v. Johnson & Johnson, 251 F.3d at 433, and would review the plan administrators' decisions de novo rather than according some deference to the plan administrators. In contrast, the defendants argue that the district court's determination conflicted with an earlier Supreme Court case, Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), and the district court should have applied the more deferential arbitrary-and-capricious standard of review. We find it unnecessary to decide whether the district court should have applied a deferential

standard of review or <u>de novo</u> review. Because all of the questions in this case turn on interpretation of what the plain terms of the plans permit and require, the results would be precisely the same under either standard of review.

A.

The Hollomans first say that the plans did not authorize Mail-Well to accelerate payments.

The Deferred Compensation Investment Plan contains a provision reading:

> VIII.  Acceleration of Payments
>
> > A.  The Board (acting by majority vote) reserves the right in its sole discretion to accelerate the payment of any benefits payable under the Plan or the Joiner Agreement, but the Board shall make no reductions in benefits other than those provided in the Plan, based on the applicable Actuarial Assumptions.

The Supplemental Retirement Income Plan contains an identical provision. Both plans also contain separate provisions granting the Board the authority to amend the terms of the plans.[2] The term "Board" refers to the ABP board of directors.

---

[2]In the Deferred Compensation Investment Plan, this provision reads:

XIV. AMENDMENT AND TERMINATION

> A.  Except as provided in B below, the Board, without consent of any Participant or Beneficiary, may at any time or from time to time amend the plan in any respect or terminate the Plan without restriction.
>
> B.  If the Participant is eligible to receive full benefits at age 62 or reduced benefits at age 60 under the terms of the Plan, the benefit to which the

10

On January 1, 1990, the ABP board amended both plans to provide that in the event of a change in control, the plan trustee would assume "sole authority to construe and to determine the effects of the provisions of the Plan and the Trust on the Participants and, if applicable, the Company."

Later, in 2000, Mail-Well acquired ABP. On July 2, 2001, with the advice of

---

Participant is entitled immediately after any amendment or termination shall under no circumstances be less than the benefit to which he is entitled before such amendment or termination became effective. In addition, notwithstanding the right of the Board to amend or terminate the Plan, the right (if any) of any Participant or Beneficiary to receive or to continue to receive payments in accordance with the terms and conditions of the Plan in effect on his retirement, death, disability or Termination of Employment, shall under no circumstances be impaired or forfeited by such amendment or termination.

In the Supplemental Retirement Income Plan, this provision reads:

XIV. AMENDMENT AND TERMINATION

A.     Except as provided in B. below, the Board, without the consent of any Participant or Beneficiary, may at any time or from time to time amend the Plan in any respect or terminate the Plan without restriction.

B.     If any participant is vested in his benefit under the terms of the Plan (i.e., he has reached age 62 or is eligible for reduced benefits at age 60), or if the sum of his age and Service equals or exceeds 75, the benefit to which the Participant is entitled (or to which he may became entitled upon reaching a certain age) immediately after any amendment or termination, shall under no circumstances be less than the benefit to which he is or would become entitled to before such amendment or termination became effective . In addition, notwithstanding the right of the Board to amend or terminate the Plan, the right (if any) of any Participant or Beneficiary to receive or to continue to receive payments in accordance with the terms and conditions of the Plan in effect on his retirement, death, disability or Termination of Employment, shall under no circumstances be impaired or forfeited by such amendment or termination.

11

its counsel and with the approval of the plan trustee, Wachovia, Mail-Well's board of directors determined that when it succeeded the ABP board, it had assumed both the authority to amend the plans' terms and the authority to accelerate payments. The Mail-Well board amended the plans to provide for one-time lump-sum payments to plan participants.

Based on these facts, the district court found that the terms of the disputed plans provided unambiguous authority for the acceleration of payments, thereby making it unnecessary for the court to review any extrinsic evidence. We agree. Mail-Well's acquisition of ABP in 2000 triggered the change-in-control provisions and, accordingly, made Wachovia, the plan trustee, responsible for determining how the change in control affected the terms of the plans. Wachovia concluded that the Mail-Well board had stepped into the shoes of the ABP board and had assumed the authority that the ABP board had previously held, including the power to amend the terms of the plans and accelerate payments of plan benefits. Quite simply, Mail-Well's decision to distribute Holloman's future payments in a lump sum plainly complied with the terms of the retirement plans. And the terms of the plans take precedence over any assurances the Hollomans may have received from Curtis 1000 employees. See, e.g., Meadows ex rel. Meadows v. Cagle's, Inc., 954 F.2d 686, 691 (11th Cir. 1992) ("When plan documents unambiguously address the

substantive rights of the parties at issue, the plan language controls . . . .").

B.

The plaintiffs also argue that even if the plans allowed Mail-Well to authorize lump-sum payments, the methods Mail-Well used to calculate the lump-sum payment to Holloman effected a reduction in benefits in violation of the terms of the plans. The provisions in the plans that govern acceleration of payments and amendment and termination of the plans clearly specify that no acceleration, amendment, or termination may reduce the benefits payable to a plan participant.[3]

The plans did not specify life expectancy estimates or discount rates to be used in calculating accelerated lump-sum payments. Accordingly, Mail-Well calculated the lump-sum payments to Holloman and other beneficiaries using a 1983 Group Annuity Mortality (GAM 83) table and a discount rate of 7%. Mercer Human Resources Consulting determined that this table was similar to the table the

---

[3]The provision governing acceleration of payments contains identical wording in both retirement plans:

> VIII.   Acceleration of Payments
>
>> A.   The Board (acting by majority vote) reserves the right in its sole discretion to accelerate the payment of any benefits payable under the Plan or the Joiner Agreement, but the Board shall make no reductions in benefits other than those provided in the Plan, based on the applicable Actuarial Assumptions.

The provisions governing amendment and termination of the plans are reproduced above. Supra note 2.

13

plans employed for the calculation of monthly payments.

The district court found that Mail-Well was entitled to summary judgment because it had acted reasonably and diligently in calculating the lump-sum payments. However, because the plan terms clearly prohibit any reduction in benefits, the issue was not whether Mail-Well acted reasonably and carefully in calculating the payments; it was whether the lump-sum payments were actually equivalent in value to the stream of future payments Holloman was to have received originally.

Nevertheless, we affirm the district court's grant of summary judgment in favor of Mail-Well, because the Hollomans did not present any affirmative evidence to show that the lump-sum payment was not fully equivalent in value to the future benefits payable. Because the Hollomans were the plaintiffs in the case, it was their burden to prove the ultimate issue of liability. Once Mail-Well filed a properly supported motion for summary judgment (which they did), the burden fell to the Hollomans to produce some evidence that could support a verdict in their favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("In response to a summary judgment motion, . . . the

14

plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' which for purposes of the summary judgment motion will be taken to be true." (quoting Fed. R. Civ. P. 56(e))).

The Hollomans did not present evidence that could support their claim that the lump-sum payment Mail-Well paid to Otis Holloman was not equivalent in value to the stream of payments that Otis Holloman was to receive in the future. We cannot accept the contention that the act of discounting Holloman's benefit payments to present value necessarily amounted to a reduction in benefits. Discounting to present value is a standard way to account for the fact that a dollar amount to be received in the future is generally worth less than the same dollar amount received in the present. By contending that Mail-Well could not discount future payments to present value, the Hollomans are essentially saying that the value of any lump-sum payment had to exceed the value of the stream of future payments that it was meant to replace. The plan terms only required Mail-Well to pay the equivalent of Holloman's future payments. It surely did not require them to pay more than the value of Holloman's future payments.

The Hollomans presented no affirmative evidence -- such as market annuity prices, or evidence of life expectancy estimates and discount rates used in the private market -- to establish the true present value of the future payments or

15

otherwise show that value of the lump-sum payment fell short of the value of Holloman's future benefit payments. All that the Hollomans offered were conclusory assertions that Mail-Well had shortchanged them; these broad conclusions standing alone could not have supported a verdict in the Hollomans' favor. Thus, the district court properly concluded that the Hollomans failed to present enough evidence to proceed to trial on their claim that the lump-sum payment was inadequate.

C.

The plaintiffs further argue that the lump-sum payment fell short because it failed completely to account for payments Jonella Holloman would receive under the plans' Last Survivor Option in the event that she outlived Otis Holloman.

The provision at issue is worded the same way in both plans:

> 4.    The Participant may request, at least one (1) year prior to his actual retirement, that he receive a reduced monthly benefit with the provision that his spouse receive a survivor benefit for life; provided, the Committee may decide in its sole discretion whether to honor such request. Such reduced amounts will be calculated individually based on the applicable Actuarial Assumptions.

The parties agree that Otis Holloman properly elected this option. Mail-Well contends, however, that only Katherine Holloman, Otis Holloman's wife at the time he elected the option, could have received survivor benefits. The Hollomans

16

say that Jonella Holloman, Otis Holloman's current wife, is also entitled to survivor benefits under the plans. The district court concluded that because the participant had to request the Last Survivor Option in advance and because the amount of the reduced payments would be calculated based on the joint life expectancy of the participant and his spouse, the terms of the plans plainly indicated that only the participants' spouse at the time of the election would be eligible to receive survivor benefits.

The Hollomans contend, however, that the district court's conclusion was incorrect for two reasons: first, the Supreme Court's decision in Boggs v. Boggs, 520 U.S. 833 (1997), supports their view; and, second, the terms of the plans made Jonella Holloman Otis Holloman's beneficiary. We remain unpersuaded.

In Boggs, the Supreme Court held that the joint and survivor annuity provision of ERISA, 29 U.S.C. § 1055, preempted Louisiana state law permitting testamentary transfers of community property interests in undistributed pension benefits. Boggs, 520 U.S. at 844. The appellants argue that Boggs identified the protection of surviving spouses as one of the core purposes behind § 1055. But Boggs does not support the appellants' claim. First of all, the provision the Supreme Court was interpreting in Boggs, § 1055, does not apply to "top hat" plans like the plans at issue in this case. 29 U.S.C. § 1051(2) (excluding top hat

17

plans from ERISA's participation and vesting requirements).

But even if the statutory purpose of § 1055 were somehow relevant, the plaintiffs' argument still would not succeed. When Otis Holloman retired and when he began receiving his plan payments, his spouse was Katherine Holloman. Jonella Holloman married Otis Holloman only after Katherine Holloman's death. ERISA's interest in protecting surviving spouses does not extend so far as to require that retirement plans ensure continued benefit payments to anyone whom a plan participant might marry after his retirement and after the death of his spouse. To begin with, even under joint and survivor annuity plans that are directly governed by § 1055, survivor annuity benefits are only available to a spouse who was married to the participant when the annuity payments began. See Dorn v. Int'l Bhd. of Elec. Workers, 211 F.3d 938, 942 (5th Cir. 2000) (per curiam) (noting that under an ERISA qualified joint and survivor annuity, "(1) the . . . annuity payments cease at the death of the participant spouse, regardless of whether his death occurs before or after the death of the non-participant spouse; and (2) if, but only if, the non-participant spouse survives the participant spouse does the survivor's annuity kick in." (emphasis added)). In addition, the statute expressly permits employers to restrict joint and survivor annuity benefits by requiring that the participant and spouse be married for at least one year before the earlier of the

18

starting date of the participant's annuity or the date of the participant's death. 29 U.S.C. § 1055(b)(4), (f)(1). It is clear, then, that § 1055 only contemplates payments to a surviving spouse who is married to the participant when annuity payments begin and outlives the participant. Section 1055 does not even indirectly support the Hollomans' position.

The appellants' second argument is that the terms of the plans made Jonella Holloman Otis Holloman's beneficiary. They point to a provision defining the term "Beneficiary" in the Plan and providing that the participant's surviving spouse becomes the beneficiary if the participant dies without having designated a beneficiary. This definition bears no relation to the Last Survivor Option under dispute. In each of the retirement plans at issue, payments to plan beneficiaries and payments to a surviving spouse under the Last Survivor Option are separate, distinct features. Payments to beneficiaries are governed by section V.A.3, which provides that if the participant dies before receiving 180 monthly payments, payments will continue to the participant's beneficiaries until the participant and his beneficiaries have received a total of 180 monthly payments.[4] The Last

---

[4]The relevant provision appears in section V.A.3 of each plan:

3.    The benefit will be payable during the Participant's life after retirement, and not less than 180 monthly payments will be made to the Participant or to his Beneficiary in the event of the Participant's death prior to receiving 180 monthly payments.

19

Survivor Option is governed by a different section, section V.A.4, which provides for lifetime payments to a surviving spouse if the participant has elected the option and the election has been approved. Only a surviving spouse is eligible for benefits under the Last Survivor Option. Nothing in the terms of the plans suggests that the benefits of the Last Survivor Option pass to the plan beneficiary if the participant's spouse dies before the participant does.

In short, we can discern no reason to reject the district court's interpretation of the Last Survivor Option.

D.

Finally, the Hollomans say that the district court erred in rejecting their claims that Mail-Well breached fiduciary obligations. The district court noted that the plaintiffs had failed to explain what precise acts had breached fiduciary obligations. It further observed, correctly, that the fiduciary responsibility provisions of ERISA, 29 U.S.C. §§ 1101–1114, do not apply to top hat plans. 29 U.S.C. § 1101(a)(1); see also Goldstein, 251 F.3d at 443 ("[W]e reject [defendant's] contention that, because ERISA's definitional section lists a 'fiduciary' as one who exercises discretion in interpreting the terms of a plan, administrators of top hat plans are also fiduciaries. To begin with, ERISA explicitly states that top hat plans are not subject to the ERISA's fiduciary

20

requirements. Further, it is well established in the caselaw that there is no cause of action for breach of fiduciary duty involving a top hat plan." (citations omitted)); Reliable Home Health Care, Inc., v. Union Cent. Ins. Co., 295 F.3d 505, 512, 516 (5th Cir. 2002) (finding that the plaintiff could not recover from a plan provider for breach of fiduciary duty because the plan was a top hat plan); Garratt v. Knowles, 245 F.3d 941, 949 (7th Cir. 2001) ("Garratt had suggested that despite preemption of his state law claims, ERISA would permit his suit against the defendants for breach of fiduciary duty. However, since a top hat plan is exempt from ERISA's fiduciary rules, Garratt would have no basis to bring such a claim."); Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 290 (2d Cir. 2000) ("[A]s the fiduciary responsibility provisions of ERISA do not apply to top hat plans, to the extent that plaintiffs' claim for breach of fiduciary duty was based upon ERISA, the district court correctly dismissed it." (citation omitted)).

Because the two plans at issue are both top hat plans, Mail-Well owed no fiduciary duties to the Hollomans under ERISA. It necessarily follows that the Hollomans have no claim against Mail-Well for breach of fiduciary duties under ERISA. Having found that the district court correctly interpreted the provisions of the two retirement plans at issue and the governing law, we have little difficulty concluding that the district court properly granted final summary judgment to

Mail-Well on all of appellants' claims.

IV

The Hollomans also argue that we should reverse and remand for trial because the district court improperly denied several motions they filed requesting that the court compel the defendants to cooperate in discovery. We are unpersuaded that the district court abused its discretion.

By court order, discovery in the case was originally scheduled to end on February 7, 2004. After that date passed, on March 3, 2004, the Hollomans filed a motion to extend time for discovery; Mail-Well did not oppose the motion. The district court agreed to extend discovery until May 7, 2004, but the district judge expressly warned the parties that she would not grant any further extensions. Indeed, the court observed, "The parties are instructed to conduct discovery in such a way as to <u>conclude</u> all necessary discovery within this time period, as no further extensions will be granted." (emphasis added).

On May 7, 2004, the last day of the extended discovery period, the plaintiffs filed a number of motions to compel discovery. The first of these motions sought to compel depositions of three individuals whom the defendants had identified in their responses to interrogatories as persons who might have knowledge pertinent to the plaintiffs' claims; sought to compel the defendants to supplement their

22

responses to interrogatories to identify persons who possessed the relevant information; sought to compel production of documents, including the document in which Otis Holloman made his spousal election; and moved for sanctions against the defense attorneys under 28 U.S.C. § 1927. A second motion sought an order compelling an individual to comply with a subpoena. The plaintiffs' third discovery motion sought to compel compliance with an April 27, 2004, subpoena ordering Marsh & McLennan, the parent company of Mercer Human Resources Consulting, to produce certain documents and to produce one of its employees for deposition. Finally, a fourth application sought to compel Wachovia to comply with an April 15, 2004, subpoena for documents believed to be related to the plaintiffs' claims.

The Hollomans withdrew the second motion before the district court ruled on it. The court denied the remaining three motions.

The Hollomans make two principal arguments: first, they say that the district court abused its discretion when it found that the plaintiffs had failed to make good faith efforts to resolve the discovery disputes as required by Rule 37 of the Federal Rules of Civil Procedure; second, they claim that the fact that they filed their notices of deposition and motions to compel within the discovery period entitled them to orders compelling discovery.

The district court denied some of the motions for reasons unrelated to whether the Hollomans had made good faith efforts to confer with the defendants: The court denied the motion to compel production of documents because the Hollomans failed to accurately cite their original discovery requests as required by local court rules. The court denied the motion to compel compliance with subpoenas to Marsh & McLennan and Wachovia because it lacked jurisdiction over subpoenas issued by other courts. And the court denied the motion to compel Marsh & McLennan to produce its employee for deposition because the plaintiffs failed to prove the subpoena ever issued. The plaintiffs' arguments therefore have little bearing on these rulings, and the plaintiffs have provided no reason for us to reverse the district court's decisions on these motions.

The remaining motions sought to compel supplementation and the depositions of three individuals named in the defendants' responses to interrogatories. The district court denied them based on what it termed a failure to work with the defendants in good faith to schedule the depositions and ensure that the defendants could comply in a timely way with their requests.

After thorough review of the record, we remain unpersuaded. At best, the plaintiffs' arguments merely urge a different interpretation of the facts. The plaintiffs have not shown, however, that the district court's interpretation of the

24

facts was untenable, or that denying the motions somehow fell outside the broad "range of choice" open to the district court under these circumstances, United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989). Accordingly, we affirm the district court's discovery rulings in all respects.

V

In the Hollomans' appellate brief, the Hollomans' attorney, Christopher Vaughn, also raised an appeal to a sanctions order the district court imposed on him under 28 U.S.C. § 1927 for filing motions to compel discovery that the district court found to have been without merit and in bad faith. As for this issue, we lack jurisdiction because Vaughn did not file a timely notice of appeal.

The federal courts of appeals are courts of limited jurisdiction. We must consider questions concerning our appellate jurisdiction on our own motion even if neither party has raised the issue. Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974–75 (11th Cir. 2005).

It is by now abundantly clear that a timely and properly filed notice of appeal is a mandatory prerequisite to appellate jurisdiction. Torres v. Oakland Scavenger Co., 487 U.S. 312, 315 (1988) (citing United States v. Robinson, 361 U.S. 220, 224 (1960)). This rule is absolute and inflexible. However, courts are forgiving in determining what constitutes effective notice of appeal. Thus, a court

25

filing may serve as an effective notice of appeal as long as it clearly indicates the party's intention to appeal and communicates the basic information required by Rule 3(c)(1) of the Federal Rules of Appellate Procedure: the names of the parties taking the appeal; the judgment or order being appealed; and the court to which the parties are taking the appeal. See Rinaldo v. Corbett, 256 F.3d 1276, 1278–79 (11th Cir. 2001); Smith v. Barry, 502 U.S. 244, 247–48 (1992); Fed. R. App. P. 3(c)(1). The notice need not always be explicit; in some circumstances notice may be adequate when the party's intent to appeal is "objectively clear" from all of the circumstances. Fed. R. App. P. 3(c) advisory committee's note.

Vaughn, however, failed to meet even the barest of these lenient requirements. He did not file any document or series of documents that indicated he sought to appeal the district court's order imposing attorneys' fees. Notably, Vaughn did not file a separate notice of appeal in his own name, and he did not list himself as a party on the Hollomans' notice of appeal. "The failure to name a party in a notice of appeal . . . constitutes a failure of that party to appeal." Torres, 487 U.S. at 314. The Hollomans' appellants' brief also did not serve as effective notice of Vaughn's intent to appeal, because it was not filed until after the deadline for filing notice of appeal.

In Corporation of the Presiding Bishop of the Church of Jesus Christ of

26

Latter-Day Saints v. Associated Contractors, Inc., 877 F.2d 938 (11th Cir. 1989), we agreed to hear an appeal from Rule 11 sanctions awarded against the plaintiff and its attorney even though the notice of appeal only named the plaintiff as an appellant. Id. at 939 n.1. In that case, however, the district court had imposed sanctions on the plaintiff and the attorney jointly and severally, and the notice of appeal specifically stated that the sanctions were the subject of the appeal. Id. In this case, by contrast, the sanctions were imposed only on the attorney, and the notice of appeal stated only that the parties (not the lawyer) were appealing the judgment of the court. This case is therefore more like Bogle v. Orange County Board of County Commissioners, 162 F.3d 653 (11th Cir. 1998), where we refused to hear an attorney's appeal from Rule 11 sanctions imposed only against the attorney because the notice of appeal only listed the client as an appellant. Id. at 661.

Vaughn did not list himself as an appellant on the Hollomans' notice of appeal, and he did not file a notice of appeal in his own name. Nor was it "objectively clear from the notice," Fed. R. App. P. 3(c) advisory committee's note, that Vaughn would be appealing the sanctions order. Vaughn therefore failed to file a proper notice of appeal, and we lack jurisdiction to hear his appeal from the sanctions order. Accordingly, we are constrained to dismiss Vaughn's appeal

for lack of jurisdiction.

AFFIRMED IN PART; DISMISSED IN PART.